Parker, C. J.
This is replevin of certain bonds and other money securities, and of certain records and documents, alleged to belong to the first church in Dedham,, of which church the plaintiffs aver themselves to be deacons.
The defendant, in his first plea, denies the property to be in the plaintiffs, and issue is joined on this point.
* In his second plea, he denies that the plaintiffs are [ * 493 ] deacons of the first church in Dedham, and issue is also joined upon this point. Both issues on trial by the jury, have been found, under the direction of the judge who sat on the trial, for the plaintiffs; and a new trial is moved for, on account of the supposed misdirection of the judge in matters of law, and also on account of the admission of some evidence and the rejection of other, contrary to the motion of the defendant’s counsel at the trial. On the hearing before the whole Court, the argument of counsel has been confined altogether to the matters of law, arising out of the direction of the judge; so that no notice will now be taken of the questions which relate to the evidence, other than to say that we see no objection to the decisions of the judge upon those questions as they arose.
The two issues of fact, which were submitted to the jury, resolve themselves into one and the same point; so that it is not now necessary to consider them separately, nor have they been so con sidered by the counsel in their argument. If the plaintiffs are not the deacons of the first church in Dedham, they are not entitled to the possession of the articles replevied; if they are such deacons, then, as the articles are agreed to belong, for certain purposes, to the proper representatives of that church, the plaintiffs are constituted. by law, the proper persons to sue for, and have the custody of, them. But this question, though simple in its form, necessarily led into a wide field of argument, and must be pursued in the same manner, in order that the reasons of the opinion which the Court have adopted, may be clearly and distinctly seen and understood.
One branch of the charge of the judge is, “ that, although the grants of land and donations to the church in Dedham purport tc be for the use of the church, yet the church could not hold the same as a corporation, never having been incorporated as a body politic ; and that said lands, and other property, did vest in the deacons of said church by virtue of the statute of 1754; and that the * deacons were to hold the same in trust [ * 494 ] for supporting the ministry, and for defraying charges *408 relating to public worship; and that, by the true construction of that statute, and other acts relating to the same subject, said grants and donations must be considered as made for the whole town of Dedham, for the purpose of supporting and maintaining public worship. That, after the erection of new parishes in said town, said property remained for the use of the remaining part of said town, which, thereupon, constituted the first parish in said town.”
There is nothing in this part of the charge which obviously affects the question, whether the plaintiffs are deacons of the first church in Dedham; but it will be seen, in the sequel, that the correctness or incorrectness of the principles laid down by the judge is essential in the consideration of the question between the parties. The defendant, as well as the plaintiffs, claims to be the deacon of the first church in Dedham, and contends that the property, out of which the securities sued for grew, belonged to the church as an ecclesiastical body, without any connection with the parish, and that the conveyances were originally to the use of the church, without any trust in favor of the parish. If this position can be maintained, it will materially affect the question whether the plaintiffs, who were appointed deacons by those members of the church who remained and acted with the parish, had thereby acquired, any. right in the property ; and so it is necessary to determine the legal character of the grants to the church in Dedham.
It should be premised, that all the securities replevied, arose from the sales of land granted to the church in Dedham, and that the records and documents relate to that property and to the proceedings of said church. The right to these securities, therefore, must depend upon the construction to be given to the grants of land of which these are the proceeds.
[ * 495] * With respect to the grant made in 1660, there cannot be a question, but that the church, however composed at that time, was intended by the grantors to be the mere trustees, to hold the same for the purpose of supporting, out of the proceeds, a pastor or minister; for such must have been the meaning of the words teaching church officer, and such was the signification given to this term in the colonial law of 1668.
The grant of the proprietors in 1642 must necessarily have a similar construction, as to the tenure of the church; for the land was granted for public use, viz., to the town, probably for training ground, burial ground, or other municipal purposes; to the church for supporting public worship, and other religious purposes (for there is no other conceivable purpose for which a church can be supposed, without some express declaration, to be made the grantees *409 of property)—and a free school, which, like the grant to the church, is another grant in effect for the benefit and use of the town.
Those of the other grants to the church, in which no use is limited, must, of necessity, have the same construction. It could not have been the intention of the grantors to convey property to the members of the church as tenants in common or joint tenants, to dispose of for the private interest and benefit of those members. The very term church imports an organization for religious purposes ; and property given to it eo nomine, in the absence of all declaration of trust or use, must, by necessary implication, be intended to be given to promote the purposes for which a church is instituted ; the most prominent of which is the public worship of God. We find no difficulty in giving the same construction to the other grants (in which a use is expressed) to the church forever. That body could not take in fee or succession, because it was not a body politic, and could neither take nor hold a legal interest in land. Nor were they intended to be cestui que trusts, for there was no trustee other than themselves appointed. To the* «se [*496] of the church, in such inartificial conveyances, could mean nothing more than that the lands or the proceeds were to be used for religious purposes ; the support of a minister, building or repairing the meeting-house, or some other object connected with, and promotive of, the public worship of God.
The church was intended to be the trustee, as in the other grants, and the term use may be construed to make a trust, when that was evidently the intention of the parties to the conveyance (1). There may undoubtedly be donations to a church without any express designation of trust, which, from the nature of the property given, ought to be considered to be in trust for church uses; such as furniture for a communion table, a baptismal font, &c. The particular use, implied from the nature of the property given, would, in such case, exclude any claim of the parish or society, as such, to such property. So property may be given to the church expressly for the use of the poor of the church; and to this the parish would have no claim. But when the donation is to the church, no trust or use being expressed, and no other implied from the nature of the property, the parish must be the cestui que trust. That it was so considered by the church members themselves, may be inferred from the manner of their dealing with it. In 1662, Joseph Kingsbury, who had, 20 years before, granted to the church in Dedham, and to the use of the same forever, three acres of land upon exchange, claimed further compensation than he had obtained—he having taken a *410 grant from Mr. Allen, the then pastor, of about four acres of land. A meeting being called, at which an elder and five others were present, they voted that he had received full satisfaction; but, as the record states, 11 not seeing light for ourselves to act any further thereon, we leave the case to the town at the general meeting.”
We consider it, then, to be clear that the grants of land to the church in Dedham were intended to vest the property in ( * 49? ] that body, for the purpose of aiding in support * of the public worship of God; and that the members of the church acquired no legal estate or personal interest therein. If we were obliged to apply the technical rules of conveyancing to these several appropriations by the town, the proprietors and individuals, we should not be able to find any estate now subsisting in the church, or its officers ; for, not being a corporation, it could not take in succession, and certainly there was no inheritance intended to be granted to the then existing members of the church. But it is well known that the early grants of proprietors, towns, &c., have always received a liberal construction, not only according to the intents of the parties, but conformable to the customs and usages then in force. Thus a mere vote of such corporations, without any deed, has been allowed to have the effect of a grant; and estates in fee simple have passed without any limitation in the vote, because it was clear, in such cases, that the corporation meant to part with all their interest in the estate as conveyed. These several grants, therefore, gave an equitable fee simple to whosoever shall be found to be the cestui que trusts, and the want of a feoffee, or grantee in trust, in whom the legal estate should vest, might, in early times, have been supplied by the county court, to whom power was ex pressly given (2) for such purposes, and has been actually supplied by the statute of 1754, which constitutes the deacons of churches the trustees in all such cases. This statute was predicated upon the fact, that much property had been conveyed to churches, who were incapable of holding in succession.
Hitherto we have gone upon the ground that, at the time when the earliest of these grants were made, there was a body of men in Dedham, known by the name of the Dedham, Church, distinct from the society of Christians usually worshipping together in that town ; and, even upon this hypothesis, we are satisfied that the church was intended to take nothing in the lands granted but estates in trust; and that, as the particular trusts intended must have [ * 498 ] been * the providing for the public worship of God in Dedham, the inhabitants at large of that town, as parish *411 loners or members of the religious society, were the proper cestui que trusts, because the effect of the grants was to relieve them from an expense they would otherwise have been obliged to bear, or forego all the benefits of a Christian ministry. But, in reverting to the history' of those times, reason will be found to doubt the application of the term church as used in the grants, in the precise and limited sense in which it is now used.
Probably there was no very familiar distinction, at that time, between the church and the whole assembly of Christians in the town. We have had no evidence that the inhabitants were divided into two bodies, of church and society, or parish, keeping separate records, and having separate interests ; but if the fact be otherwise than is supposed, there is no doubt that most of the inhabitants of the town were church members' at that time. In the year 1631, ten years only before the earliest of these grants, it was provided, by a colonial law, that no inhabitants should have the political' rights of a free man, unless he were a member of some orthodox church. The presumption is violent, then, that almost if not quite all of the adult inhabitants of Dedham, and other towns, were church members, and a grant to the church, under such circumstances, could mean nothing else.than a grant to the town ; except that a designation of the use of the property might be inferred from the denomination of the grantee. That this was the state of things, will not be doubted by those who look into the ancient tracts and writings respecting the churches in New England. Before the migration of our ancestors to this country, it is believed a Congregational church was, as it was in the earliest times of Christianity, an assembly of Christians meeting together in the same place, for the public worship of God, under the same minister or ministers. Mr. Wise, a writer on this subject, defines a particular church to be “ a society of Christians * meeting together in one place, [ * 499 ] under their proper pastors, for the performance of religious worship and the exercising of Christian discipline, united together by covenant,” as most of those undoubtedly were who composed that society. Parochia, or -parish, he says, signifies, in a church sense, a competent number of Christians dwelling near together, and having one bishop, pastor, &c., or more, set over them, Therefore parish, in this sense, is the same with a particular church or congregation; and this, he observes, is plainly agreeable with the sense, custom, and platform of the New England churches: a whole diocese is one parish, it not exceeding, in ancient times, the bounds of a parish or a small town, or a part of a town.
All the people of a diocese did, every Sunday, meet together in *412 one place to celebrate divine service. The bishop had but one altar or communion table in his diocese, -at which his whole flock received the sacrament from him.
The whole diocese met together on Sunday, when he gave them the eucharist.
All the people were present at church censures; none were restored without the knowledge and consent of the whole diocese; they might plead their cause before the whole people. When a bishop died, all the people met together in one place to choose a new bishop. The whole diocese met together to manage church affairs. Such was the church in the early times of Christianity, and such, it is presumed, was the church, as understood by our ancestors in the first settlement of this country. For one great bbject in separating from the established church, was, that they might restore the simplicity of the primitive Christian churches. We know that, at this day, it is the practice of the Episcopal churches to have the sacrament administered to all the flock or parish; and, indeed, that it is urged upon all, as a duty, to come to the table and partake, without setting up any distinction between members of the same 0 society; and, in this respect, they conform more to the [ * 500 ] practice of the primitive Christian churches, than * most of those do who dissent from their form of worship. No doubt the more pious part of the congregation soon had occasion to withdraw from those they deemed profane and immoral, or who denied some of the doctrines held to be essential, and to establish a distinction by particular covenants or professions between the more serious and devout Christian, and him who was thought to be such in name only; and this necessity originated the distinction between Bhurch and congregation, which was afterwards, and is now, so well marked and known. From this account of the ancient state of things, it may well be conceived, that a person intending' to give property to pious uses, and particularly for the support and maintenance. of public worship, within the first half century after the migration of our ancestors, would denominate the donees—the church, meaning the whole society of worshipping Christians; and if his donation should be afterwards applied to the use of a few Christians, who had constituted themselves the church, instead of the whole society, his bounty would be perverted. The later grants irorn the proprietors were undoubtedly made for the same purposes, and with the same intentions ; for, there being then but one church and one Christian society in Dedham, the proprietors, or the clerk who made the record, would be likely to adopt the phraseology which had been before used; and these grants should have the *413 same construction as the earlier ones, although the distinction between church and town, or parish, might then have been known.
Considering, then, that the land granted was for the beneficial use of the assembly of Christians in Dedham, which were no other than the inhabitants of that town who constituted the religious society, within which the church was established, these inhabitants were the cestui que trusts, and the equitable title was vested in them, as long as they continued to constitute the assembly denominated the church in the grants.
* Since the grants were made, parishes have been set [ * 501 ] off in the town, and other churches have been established within these parishes; but a residuum has always been left, which, by the statutes of the government and the decisions of the courts, have thus become the first parish, and have lawfully succeeded to all the rights vested in the inhabitants of the town, of a parochial nature, which have not been parted with in some legal form. In 1754, the legislature, having found that much property bad been given to churches, with intention that the same should be held in perpetual succession, constituted the deacons a corporation with the power of holding the property, for the purpose of executing therewith the will of the donors.
It is asked, where was the legal estate before the passing of this statute, if not in the church? It is answered, it was de facto, though not de jure, in the church, who held it as trustees, and without doubt used it as such. No disputes or questions appear to have arisen about it, for all parties interested acted harmoniously, and it was to avoid difficulties and disputes, that the legislature passed the statute of 1754, constituting the deacons trustees, and giving to the church supervisory powers, in thé nature of visitation, that they might compel the deacons to appropriate the proceeds of the property according to the will of the donors.
And we are now brought to the question, whether the plaintiffs have proved themselves to be deacons of the same church, to which the grants were original!) made, for the trusts before mentioned.
Until the invitation was given to Mr. Damson (the present officiating minister in the first parish in Dedham), the church and congregation appear to have acted in unison, and the funds held by the church arising from the grants of land, which have been considered, have been, from time to time, applied, as needed, to the support of the minister, and to defray other charges relating to public worship. This was in conformity to the spirit of the trust, * and is a sufficient explanation in itself of the [ * 502 ] kind of interest which the church claimed in the prop *414 erty. On the dismission of the Rev. Mr. Bates from the pastoral charge of the church and congregation in Dedham, at his own request, the unhappy dissension arose, which has terminated in a dismemberment of the society, and a litigation about the property Mr. Damson was elected by the parish, at a regular parish meeting, to be the successor of Mr. Bates. The church refused to concur in the choice; a majority of this body disapproving of his religious tenets, or for other causes. The parish, with the minority of the church, invited a respectable council, consisting of the ministers of several churches and delegates, who advised to the ordination of Mr. Damson over the parish, and who, accordingly, ordained him, notwithstanding the remonstrance of a majority of the members of the church, who finally seceded from the parish, and never, since the ordination of Mr. Damson, have attended public worship there, but have, in another place within the territorial limits of the parish, attended public worship, and had the ordinances administered to them as a church.
After the ordination of Mr. Damson, a church meeting was called, at. which the members who acted with .the parish attended ; and they voted to remove from office the former deacons, who seceded with the majority of the old church, and elected the plaintiffs in their stead.
The members who seceded claim still to be the first church in Dedham, and the successors of the church to which the property was given in trust; and the defendant claims to be the deacon of that church, and, as such, claims a right to hold the property.
In whatever light ecclesiastical councils or persons may consider the question, it appears to us clear from the constitution and laws of the land, and from judicial decisions, that the body, which is to be considered the first church in Dedham, must be the church of the first parish in that town, as to all questions of property [ * 503 ] which depend upon * that relation. This point was distinctly settled in the case of The Deacons of the first Church of Sandwich vs. Tilden, in which the Court went into a full discussion of the principles on which their decision was founded; but as the council employed declined arguing the case, no report has been made of it (3).
*415 If a church may subsist unconnected with any congregation or religious society, as has been urged in argument, it is certain that it has no legal qualities, and more especially that it cannot exercise any control over property which it may have held in trust for the society with which it nod been formerly connected. That any number of the members of a church.who disagree with their brethren, or with the minister, or with the parish, may withdraw from fellowship with them, and act as a church in a religious point of view, having the ordinances administered and other religious offices performed, it is not necessary to deny; indeed, this would be a question proper for an ecclesiastical council to settle, if any should dispute their claim. But as to all civil purposes, the secession of a whole church from the parish would be an extinction of the church ; and it is competent to the members of the parish * to institute a new church, or to engraft one upon the old [ * 504 J stock if any of it should remain ; and this new church • would succeed to all the rights of the old, in relation to the parish. This is not only reasonable, but it is conformable to the usages of the country; for, although many instances may have occurred of the removal of church members from one church or one place of worship to another, and no doubt a removal of a majority of the members has sometimes occurred, we do not hear of any church ceasing to exist, while there were members enough left to do church service. No particular number is necessary to constitute a church, nor is there any established quorum, which would have a right to manage the concerns of the body. According to the Cambridge Platform, ch. 3, § 4, the number is to be no larger than can conveniently meet together in one place, nor, ordinarily, fewer than may conveniently carry on church work. It would seem to follow, from the very structure of such a body as this, which is a mere voluntary associa tian, that a diminution of its numbers will not affecl its identity. *416 A church may exist, in an ecclesiastical sense, without any officers, as will be seen in the Platform ; and, without doubt, in the same sense a church may be composed only of femes covert and minors who have no civil capacity. The only circumstance, therefore which gives a church any legal character, is its connection with some regularly-constituted society; and those who withdraw from the society cease to be members of that particular church, and the remaining members continue to be the identical church. This is analogous to the separation of towns and parishes—the effect of which, by law, is, to leave the original body politic entire, with its powers and privileges undiminished, however large may be the proportion which secedes. And so it is of all voluntary societies, having funds to be disposed of to charitable uses in any particular place. A refusal of a majority of the members to act would devolve all • power over the subject upon those who might choose [ * 505 ] * to persevere. Numerous fire societies, and other voluntary, associations having funds, have acted upon this principle.
It is said, in argument, that churches may subsist without connec tian with any parish or religious society ; and the churches of Harvard College, Dartmouth College, and the Andover Institution, are cited as instances. We have before said that it was not intended to deny that there may be such churches in an ecclesiastical sense ; but there is not appertaining to them, as churches, any civil rights or privileges, by virtue merely of their association as members of a church. These very churches may possibly be religious societies under the statute of 1811, called the religious freedom act, and may, as such, exercise power, quasi a body politic, to a certain extent; but this does not tend to show that a church, which had existed within a parish, and as such has had the custody and the disposition of property for parish purposes, can disunite itself from the parish, and retain, nevertheless, all the property, and dispose of it to other uses, or to similar uses, in another parish. If all the members of a church so situated should withdraw, leaving not even the deacons, or members enough to elect them, it might be necessary, perhaps, to apply to the legislature, in the absence of a court of chancery, to appoint some new trustee of the property, until a new church should be organized within the parish. But wheie members enough are left to execute the objects for which a church is gathered, choose deacons, &c., no legal change has taken place ; the body remains, and the secession of a majority of the members would have no other effect than a temporary absence would have upon a meeting which bad been regularly summoned.
That a church cannot subsist without some religious community *417 to which it is attached, with the exceptions before stated, is not a new theory. It has, we believe, been the understanding of the people of New England, from the foundation of the colonies. A few anomalous cases can have no bearing on the question. All the numerous laws, * which were passed by the colonial [ * 506 ] and provincial legislature, in relation to churches, are predicated upon a supposed connection with some body politic; and, in the year 1800, a decisive expression of the public opinion was gixen in an act of the legislature, which provides for the public worship of God and for other purposes; for, by the first section of that statute, it is enacted, “ That the respective churches, connected and associated in public worship with the several towns, parishes, precincts, districts, and other bodies politic, being religious societies, shall at all times have, use, exercise, and enjoy, all their accustomed privileges and liberties, respecting divine worship, church order and discipline, not repugnant to the constitution (4).
The consequences of the doctrine contended for by the defendant, will glaringly show the unsoundness of the principle upon which the argument is founded. The position is that, whenever property is given to a church, it has the sole control of it, and the members, for the tipie being, may remove to any other place, even without the commonwealth, and carry the property with them.
Now, property bestowed upon churches has always been given for some pious or benevolent purpose, and with a particular view to some associated body of Christians. The place in which the church is located, is generally had in view by the donor, either because he there had enjoyed the preaching of the gospel and the ordinances, or because it was the place where his ancestors or his family and friends had assembled together for religious purposes. These associations will be found to be the leading motive for the particular direction which his charity has received. If he gives "to a church for the general purpose of promoting piety, or for the use of the poor of the church, he generally designates the body by the place where it is accustomed to worship. Thus, if a donation were made to the Old South church, Park-street church, Brattlestreet church, or any other that might be thus * designa- [ * 507 ] ted by local qualities, it must be supposed that the donor had in view the society of Christians worshipping in those places; and as his donation is intended to be perpetual, that he had regard to the welfare of successive generations, who might become worshipping Christians and church members in the same place. If the whole society should find occasion to remove to some other *418 place in the same town, the identity might be preserved, and the bounty enjoyed as he intended it. But if the church alone should withdraw, and unite itself to some other church, or to a new and different congregation, it would be defeating his intentions to carry the property with them, and distribute the proceeds in a community for the members of which he may have never entertained any particular feelings of kindness.
To divert the charity from the poor of the Old St nth church, to the poor of the church in Park-street, would be to violate the will and design of the donor, as effectually as to apply it to the support of the town’s or state’s poor. So, of property given for the support of public worship in any particular place.
It being, as we think, established that the members of the church, who withdrew from the parish, ceased to be the first church in Dedham, and that all the rights and duties of that body, relative to property intrusted to it, devolved upon those members who remained with and adhered to the parish ; it remains to be considered whether the plaintiffs weré duly chosen deacons of that church, and so became entitled to the possession of the property, as the trustees under the statute of 1754, as stated by the judge in his charge to the jury And, as this was thought to depend upon the validity of the settlement and ordination of Mr. Damson, which took place in November, 1818, it has seemed to become necessary to look into the facts which led the judge to state to the jury, “ that Mr. Damson was legally ordained, as minister of said first parish, and that those members of f * 508 ] the church who adhered to the parish and * united with them on this occasion, must be considered as the church in said first parish in Dedham, and the successors of said ancient church, and that those members of the church who withdrew from the parish and refused to concur in the proceedings of the majority of the inhabitants of said parish in the ordination of Mr. Damson, c ould not, in law, be considered as a church, so as to entitle them (though a majority) to hold, appropriate, or control, said ministerial or church fund or property.”
The objection to the settlement of Mr. Damson rests altogether upon the supposition that there could be no legal settlement and ordination, unless the church, as a distinct body from the parish or congregation, had assented to his call, and concurred in the proceedings preliminary to his settlement; and it is upon this ground, also, that the ordaining council are supposed to have had no authority in the matter, they being invited by the parish and a minority of the members of the church, but not by the church itself, to which body, it is alleged, belongs solely the right of convening a council upon such occasions.
*419 That the proceedings of the parish and the council were not conformable to the general usage of the country, cannot be denied. But the parish allege, in vindication of their departure from this usage, their constitutional right to elect and contract with their minister, exclusively of any concurrence or control of the church; and the necessity they were under to proceed as they did, because the church had refused to concur with them in the choice, and in the invitation to the ordaining council. That the parish have the constitutional right contended for, cannot be questioned by those who will pursue the clause of the third article of the Declaration of Rights, upon winch this claim is asserted. It is there provided, “ that the several towns, parishes, precincts, and other bodies politic or religious societies, shall at all times have the exclusive right of electing their public teachers, and of contracting with them for their support and maintenance.” This is too * explicit [ * 509 ] to admit of cavilling or to require explanation, as every constitutional provision for the security of civil or religious liberty ought to be. All preexisting laws or usages must bow before this fundamental expression of the public will; and however convenient or useful it might be to continue the old form of electing or settling a minister, whenever a parish determines to assert its constitutional authority, there is no power in the state to oppose their claim.
It has been supposed by counsel in the argument, that there is a distinction between a public teacher, whose election is thus provided for in the Declaration of Rights, and a minister or pastor of a church, in the ecclesiastical or clerical sense of these terms ; and that, although a civil contract may be made with the former, binding upon the parish, he is not vested with a religious character or office, so as to be entitled to the privileges of a minister of the gospel. But we see no ground for such distinction. A teacher of piety, religion and morality, is a minister of the gospel within the meaning of the Declaration of Rights; and it is a strange supposition, that the framers of the constitution, or the people, had respect, in this provision, to a class of men not known at the time the constitution was formed ; to whom should belong only a part of the character, duties and privileges of ministers of the gospel. The term teacher was made use of as nomen generalissimum, to embrace the clerical head of every denomination of Christians in the state. It was well known, that, in early times, certain titles used in the established church were offensive to our modest ancestors, as savoring of ecclesiastical distinction, and that the terms teacher, teaching elder, teaching officer, &c., were commonly used, in lieu of other official designations known in the English church. By a colonial law of 1668, it is provided, that teaching officers of churches should be the ministers to all the *420 inhabitants of the towns in which the churches over which they are placed shall be planted. If a teacher of piety, |*510] * religion and morality, in the sense of the Declaration of Rights, does not mean ministers of the gospel, then the provision is senseless and nugatory ; for there was not then, nor is there now, any such officer known in the parishes or churches. It was supposed that this distinction was countenanced by the late Chief Justice Parsons, in the opinion delivered by him in the case of Avery vs. The Inhabitants of Tyringham, 3 Mass. Rep. 160. His words are, “ By the constitution, the rights of the town are enlarged, if it choose to exercise them, and those- of the church impaired. If the church, when the election has been disapproved by the town, shall unwisely refuse to make a new election, or the town, for any cause, shall abandon the ancient usages of the country in settling a minister, it may, without or against the consent of the church, elect a public teacher, and contract to support him ; and such a teacher will have a legal right to the benefit of the contract, although he cannot be considered a settled minister of the gospel, agreeably to the usages and practice of the Congregational churches in the state.” He then goes on to recommend an adherence to those usages, and to deprecate a departure from them, except in cases of necessity.
We agree with him in estimating highly these ancient usages, protected as the people are by the constitutional provision, and in hoping they may be observed in future, as they have been in past times. But we cannot think, nor can it be inferred from his observations that he thought, that a teacher chosen by the parish, without the consent of the church, and publicly set apart by ordination over the parish, would not be a settled minister of the gospel; although he would not be so according to the usages and practice of the Congregational churches in the state. For the constitution supersedes those usages, where the parties do not choose to observe them ; and to deny the character of ministers of the [ *511 ] gospel to those who are chosen according * to the constitution, would be to repeal the constitution and ••ender it nugatory.
There is one religious society (5) in the state at least, probably there are many, which, from its foundation, even before the adoption of the constitution, has departed from the general usage in the mode of settling their ministers. In this society there has been a long line of able, pious, learned ministers, teaching their flock for many generations, administering the holy ordinances of baptism and the *421 Lord’s supper, associating with the reverend clergy who may have been settled according to the common usage, and interchanging official duties with them. Will any one refuse to these teachers the character of ministers of the gospel, because they were not settled “according to the usages and practice of Congregational churches in the state?” We apprehend not. The practice in this society has been, immemorially, for the parish only to choose the minister, church members acting only as parishioners ; and the church is requested, as a matter of courtesy, to invite the ordaining council. As in former times, particularly at the period of forming our constitution, many distinguished citizens belonged to this society, it is not improbable that the constitutional provision emanated from them, for it is exactly conformable to the practice of this society since its foundation. And, if uninterrupted harmony for near a century between church and society, and repeated unanimity in the choice of a minister, is any evidence of the merits of any system, there need be no apprehension of those disorders, which some have imagined will follow a general execution of the constitutional privilege. The distinction suggested is founded upon the hypothesis that the people, in establishing the provision in the third article, meant only to secure the right in towns, &c., to elect certain civil officers to be called teachers of piety, religion, and morality, like schoolmasters, who were not to be vested with a sacred or religious character or * privileges ; and that, in [ *512 ] order to endow them with these, there must still be an appointment by the church, or some other body foreign to the town or parish. But this would have been going only half way in establishing the right of the people ; for the most interesting, if not the principal, office of a minister is of a religious nature ; such as administering the holy ordinances to those who should seek them ; and of this benefit the people would be deprived at the will of the church, if such is to be the construction of the constitution. Indeed, if the church and congregation should concur in the choice of a minister, and other churches should, from disagreement with their creed, decline to advise to, and assist in the ordination ; upon this close construction, the person chosen might be a teacher, but he could not be a minister of the gospel, because not settled according to the usages and practice of the Congregational churches; for tnose usages require a council, composed of the ministers and delegates of other churches, to give validity to an ordination.
What is the essential virtue and public benefit of an ordination ? Surely, it is nothing but setting apart, installing or inaugurating, one who has been chosen to the office, and tendering to him the "ellowship of the churches who assist in the ceremony. It will not *422 now be contended, that any spiritual or temporal power is conferred by the imposition of hands. Ordination, according to the Platform, is nothing else but the solémn putting a man into his place and office in the church, whereunto he had a right before by election ; being like the installation of a magistrate in the commonwealth. “Ordination is therefore not to go before, but to follow election.” Again;—“ Ordination doth not constitute an officer, nor give nim the essentials of his office.” Cambridge Platform,, ch. ix. sec. 2. It is true, that the election here spoken of is an election by the church ; but whenever, by change of law or usage, the right of election come to the congregation, the principles in regard [*513] to ordination are applicable. The people having *the constitutional right to choose, they must have the right to have the minister of their choice set over them, or the former right would be in many important respects useless. If, then, the church would obstruct their wishes, by refusing to concur in calling a council, they have a right to invite one themselves ; or if, upon prudential motives, or from adherence to old forms, they could find no ministers or churches to aid them, they would have the right, by some public solemn act, to carry into full effect their constitutional privilege, and thus to secure to their pastor all the privileges and immunities of a public teacher of piety, religion and morality, and of a minister of the gospel. This doctrine is as old as the history of the New England churches ; for the first minister of Salem was set apart by the lay brethren, accident having prevented the clergy who were expected from attending; and though, after they arrived, they participated in the ceremony by giving the right hand of fellowship, this act was not an essential part of ordination. They seem not to have doubted the right of the people to give publicity to their choice ; for although, after they formed themselves into a church state, they installed their ministers anew, it does not appear that any council was called in for this purpose. And the Cambridge Platform recognizes the principle ; for in sec. 4, ch. 9, it is said, if the people may elect officers, which is the greater, and wherein the substance of the office doth consist, they may much more (need so requiring) impose hands in ordination, which is the less, and but' the accomplishment of the other.
We consider, then, the non-concurrence of the church in the choice of the minister, and in the invitation to the ordaining council, as in no degree impairing the constitutional right of the parish. That council might have refused to proceed, but the parish could not by that have been deprived of their minister. It was right and proper, as they could not proceed according to ancient usage, because of the dissent of the church, to approach as near 1*514] to * it as possible by calling a respectable council, and *423 having their sanction in the ordination. And it was certainly wise in that council, finding that the points of disagreement were such as would be likely to cause a permanent separation, to yield to the wishes of the parish, and give their sanction to proceedings which were justified by the constitution and laws of the land. They ord .lined him over the parish only; but, by virtue of that act, founded upon the choice of the people, he became not only the minister of the parish, but of the church still remaining there, notwithstanding the secession of a majority of the members. Mr. Damson thus became the lawful minister of the first parish in Dedham, and of the church subsisting therein; and he had a right to call church meetings, and do all other acts pertaining to a settled and ordained minister of the gospel. The church had a right to choose deacons, finding that the former deacons had abdicated their office, and thus no' legal objection is found to exist against their right to maintain this action.
Farther we need not go; but it may not be useless to pursue historically the agency of the church in the choice and settlement of ministers, from the earliest times of the commonwealth.
As was observed in the discussion of the first point, there appeared to be little practical distinction between church and congregation, or parish, or society, for several years after our ancestors came here. It was not till the year 1641, that we find any legislative recognition of the right and power of churches to elect ministers. Before that period, without doubt, the whole assembly were considered the church, or so great a portion of it, that no necessity of any regulation could exist. But in that year, the right to gather churches under certain restrictions was established, and the power of electing church officers, comprehending, without doubt, ministers, was vested in the church. How the ministers before that time were supported does not appear ; but, it is probable, by voluntary * contribution ; for it does not appear that any legal [*535 ] obligation was created before the year 1652. Even then, so great a proportion of the adult inhabitants of the town must have been church members, that probably there was no immediate complaint, that a part of the parish had the right given tc them by law to impose a minister upon the rest, who had no voice in his election. By the colonial statute, the right of ordaining the minister was also given to the church, which had also the power of admission, recommendation, dismission and expulsion, or disposal of their officers and members upon due cause, according to the roles of the word.
In 1658, it was provided, that no person should preach publicly and constantly to any company of people, whether in church society *424 or not, or be ordained to the office of a teaching elder, where any two organic churches, council of state, or general court, shall declare their dissatisfaction thereat, either in reference to doctrine or practice. And in case of ordination of any teaching elder, timely notice thereof was to be given unto three or four of the neighboring organic churches, for their approbation.
This, probably, was the origin of the councils called to aid in the ordination of the ministers; and it was their business to inquiie into the qualifications of the candidate, and probably into his theological creed, in order that no new or strange doctrines might interrupt the uniformity of faith then existing, and thought to be essential.
At this period, the power and functions of a council were important ; for, as all Congregational churches (and it is not known there were any other at that time) agreed in doctrine and in form, if the minister could not satisfy the council, he could not be ordained : such a council being essential, by the existing law, to an ordination.
At the present time, the authority of such councils is much impaired ; for if the church or parish and minister agree, they will summon such a council as will approve their views ; and [ *516 ] if they should be mistaken in their selection, they * will invite a new council, and so on, toties quoties, until they find one which will gratify their wishes. This was done at Deer-field some years ago, and other instances have occurred within the commonwealth. So that an ordaining council, now, is of little more efficacy than to give publicity to the act of the people in choosing their minister, and solemnity to his induction into office.
- In 1654, authority was given to the county court to assess upon the inhabitants a proper sum for the support of their minister, if any defect existed ; and this, probably, was the first coercive power given for this purpose. This law seems to have been reenacted in the year 1660.
Notwithstanding the law of 1641 vested the power of choosing minist< rs in the churches, it is probable that some of the town or parish, not members of the church, when compelled by law to pay the minister, used to interfere in the elections upon the ground (not an unreasonable one) that, as they were subject to pay their proportion towards his support, they ought to share in the privilege of electing him ; or perhaps they construed the law to mean that all the worshipping assembly were the church for such purposes. For, in 1668, it was thought necessary to enact again, that the church should elect all her officers ; and, in this statute, the term church is explained to mean those who are in full communion only, and the teaching officer of the church is declared to be the minister of the whole people. And it was further nrovided, that no inhabitant of *425 any town should challenge a right unto, or act in, the calling or election of such officer or minister, until he be in full communion, upon the penalty of being accounted a disturber of peace and order, and to be punished by the court of the shire, either by admonition, security for good behavior, fine, or imprisonment, according to the quality or degree of the offence.
Such a law could not have been wanted, if the church quietly possessed the exclusive right given to it by the statute of 1641, of electing and ordaining the minister.
*It probably, too, was insisted upon, by those who were [ * 517 ] denied the right of voting, that the person appointed against their will might be the officer of the church, but was not the minister of the people, and this surely was sound republican doctrine. But the legislature settled the point, by declaring that the church should choose the minister, and that he, nevertheless, should be the minister of the people, and they should be bound to pay him.
This system, though perhaps necessary for the times, was so uncongenial with the free principles which laid the foundation of the New England churches, that although it probably was submitted to without actual resistance, yet it was not acquiesced in. About thirty years after this, in the 4th of Will. &f Mary, an act passed the legislature, vesting the appointment of ministers in the inhabitants of the town, and providing that if they neglected this duty for six months, the court should provide a minister, and cause him to be settled within the town. By this act the power of churches, as a distinct body, to choose the minister, seems to have been entirely taken away ; and lest, by implication, all their other powers should be construed to be abolished, the third section of the statute provides, that the respective churches within the province shall, at all times hereafter, use, exercise and enjoy all their privileges and freedoms respecting divine worship, church order and discipline, and shall be encouraged in the peaceable and regular profession and practice thereof. This statute placed the parishes and the churches upon the "same footing as did the constitution of 1780, and the law of 1800, which has been before referred to.
It seems that in the same year another statute passed, vesting the power of choosing the minister explicitly in the major part of the inhabitants of the town, restricting them in the choice to a person of good conversation, able, learned and orthodox ; for such a statute is recited in the statute of the 5th of Will. &f Mary, ch. 16, sec. 7. But, in another statute, it is declared that, upon further consideration, the * method proposed for the choice of a [*518] minister has, in divers towns, been found impracticable, and by the eighth section of this last statute, the forme- is repealed. *426 And by the ninth section it is provided, that each respective gathered church, in any town or place within the province, that at any time shall be in want of a minister, shall have power, according to the directions given in the word of God, to choose their own minister; and the major part of such inhabitants as do there usua ly attend on the public worship of God, and are by law duly qualified for voting in town affairs, concurring with the church’s act, the person thus elected and approved, accepting .thereof and settling with them, shall be the minister, and all the inhabitants shall be liable for his support. In the same statute it was enacted, that in such towns and places where there was no church gathered, the inhabitants should, with the advice of three neighboring ordained ministers, choose and call an orthodox, pious and learned person to dispense the word, &c.
But in two years from this, the system was again changed ; for it was then enacted that when the church should make choice, if the town did not concur, the church might call in a council of the elders and messengers of three or five neighboring churches ; to which council was given the power of examining and deciding upon the question between town and church ; and if they approved the choice of the church, the minister might be settled, notwithstanding the non-concurrence of the town.
No other law was passed upon the subject, during the continuance of the provincial government.
From these several colonial and provincial regulations, the efforts of the churches to obtain, preserve, and, when lost, to recover their power, particularly in the choice of ministers, may be very clearly discerned. In 16*41, it was absolutely vested in the church. Shortly after this, the inhabitants, being compelled to pay, claimed a right to vote ; but the legislature lent its aid to the church, [ * 519 ] reenacted * its power, and punished those who should attempt to vote, not being church members. This was in 1668. Soon after the charter of King William, and when the disproportion in number between church and congregation was probably greater than it had formerly been, the correspondence between taxation and election being better understood, or more earnestly insisted on, the corporation or parish, which was made liable by law to maintain the minister, claimed the right to choose him, exclusively of the church, and the right was recognized and established by the legislature.
But this endured but a short time,—not long enough to try an experiment,—for the very next year, the church claimed a concurrent right with the congregation, and this was granted. If harmony subsisted between the church and congregation, this system would *427 have been satisfactory; but it being foreseen that the two bodies might disagree, and that there might be a long vacancy in the ministerial office, the right of the church was reestablished by law, which was in effect exclusive; the right of the congregation to concur being merely nominal, as the church might call in a council to suit itself, and by that council their choice might be ratified, notwithstanding the dissent of the congregation.
History gives us no account of the operation of this system If it was acquiesced in, it was probably because a difference between church and people seldom occurred ; and when it did, that the minister chosen by the church was too wise to accept, or perhaps the council in such cases composed differences, or advised the church to waive its pretensions. It is not probable that in a period when the knowledge of civil and religious rights was rapidly increasing, and the zeal for them becoming every day more ardent, as it must have done between the enactment of the last-mentioned law and the revolution, that any congregation in the province would have submitted to have had *a minister imposed upon [ * 520 ] them against their will, and at the same time to be chargeable with his support.
But still instances of disagreement must have now and then occurred, and the public sentiment was gradually verging towards the broad and liberal principle, which was adopted in the constitution ; a principle, in reference to religious privileges, correspondent with that which was established in relation to civil rights, that the citizen who contributed towards the support of the government, should have a share in the election of those who were to administer the government.
The right is now, oy a fundamental law, which cannot be repealed, vested in the body politic, which is made liable to the duty, and for the support.
Churches, as such, have no power out that which originally belonged to them, and which was recognized in the provincial statute of 1692, and again in the statute of the commonwealth of 1800, viz., of divine worship and church order and discipline. They still retain, by courtesy, the practice of nominating to the congregation, and there is seldom any disagreement. As long as this privilege shall be discreetly exercised, without doubt it will continue. We are not desirous of impairing it, but being called upon to declare the law of the land on a question of property, it is not in our power to yield to prejudices, however long they may have endured, or however useful, in the opinion of some, may be their continuance.
It has been suggested, that the usage of churches has been so general and constant, ever since the adoption of the constitution *428 that it may now be set up as law, although contrary to the Declaration of Rights. But constitutional privileges can never be lost bj mere non-user. Neither individuals, nor aggregate bodies, nor the government itself, can prescribe against the rights of the citizen, with respect to any privilege secured by the constitution.
Indeed, we apprehend those are mistaken, who imagine that the cause of religion would be served, public worship [ * 521 ] * promoted, or instruction in piety, religion and morality more extensively encouraged, by restoring to the churches the power they once enjoyed, of electing the minister without concurrence of the people or congregation, or by the aid of a council which they might select to sanction their choice. Nothing would tend more directly to break up the whole system of religious instruction ; for the people never would consent to be taxed for the support of men in whose election they had no voice. It is an undoubted fact, that the male members of the churches form but a small part of the corporation which makes the contract, and is obliged to perform it; and it is not at all consistent with the spirit of the times, that the great majority should, in this particular, be subject to the minority. To arrogate such a power, would be to break up, in no distant period, every parish in the commonwealth.
The authority of the church should be of that invisible, but powerful nature, which results from superior gravity, piety, and devout example. It will then have its proper effect upon the congregation, who will cheerfully yield to the wishes of those who are best qualified to select the candidate. But as soon as it is challenged as a right, it will be lost. The condition of the members of a church is thought to be hard, where the minister elected by the parish is not approved by them. This can only be because they are a minority ; and it is one part of the compensation paid for the many blessings resulting from a state of society. A difficulty of this nature surely would not be cured by returning to the old provincial system of letting the minority rule the majority ; unless we suppose that the doctrines of a minister are of no consequence to any but church members. Besides, in. the present state of our laws, and as they are likely to continue, there is no hardship, although there may be some inconvenience ; for dissenting members of the church, as well as of the parish, may join any other church and society, " # 522 ] or they may institute a * new society ; so that they are neither obliged to hear nor to pay a minister, in whose settlement they did not concur. It is true, if there are any parish funds, they will lose the benefit of them by removal ; but an inconvenience of this sort will never be felt, when a case of conscience is in question.
*429 Having established the points necessary to settle this cause, viz., that the property sued for belongs to the first church in Dedham, sub modo; that is, to be managed by its deacons under the superin tendence of the church, for the general good of the inhabitants of the first parish, in the support of the public worship of God,—that the members of the church now associated and worshipping with the first parish, constitute the first church,—and that the plaintiffs are duly appointed deacons of that church ; it follows that the verdict of the jury is right, and that judgment must be entered accordingly.

7-8"> 7 Mass. Rep. 180, Newhall vs. Wheeler.

 1641, Anc. Laws, 52.

 The case referred to, was briefly this. In the year 1786, Doct. Hearsay devised certain real estate in the county of Barnstable to a number of churches, directing the deacons of the several churches to receive the profits and pay them over to the ministers, to be, by them, applied to the purchase of certain religious books, which were to be distributed among the members of the church. Among others, the Con^vegational church in Sandwich was the object of his bounty. At the time of his death, and for many years, there was but one such church in that town. Upon application to the legislature from all the devisees, authority was given to alienate the land, *415 and distribute the proceeds in money to the deacons of the several churches mentioned in the will, in the proportion therein prescribed Mr Tilden, the defendant, was the agent, and the action was brought to recover the proportion belonging to the church in Sandwich; the plaintiffs styling themselves deacons of the first church in Sandwich. , .
In 1811, the parish voted to dismiss Mr. Burr, the minister, a great majority of the church non-concurring. These, together with the minister and a minority of the parish, formed themselves into a new society, were incorporated as a poll p-risu. and the members of the church claimed to be the first church in Simdwich, and the action was defended at their instance and request. The cause was decided in favor of the plaintiffs, on the ground that the church whicli was attached to and connected with the first parish was necessarily the first church, and was the lawful successor to the church to which the devise was made. It had been before decided, that the dismission of Mr. Bu/rr was regular and lawful, notwithstanding more than three fourths of the church members adhered to him, and continued, in another place, to" sit under his ministry. See the cas* Burrv s. The Inhabitants of the first Parishin Sandwich, 9 Mass. Rep 277*

 Stat. 1799, c. 87.

 Brattle Street, in Boston.