SAMUEL TIBBALLS & others *vs.* JOHN D. BIDWELL & others.

The subscribers to a permanent fund for the support of public worship were incorporated by the legislature, on their petition, as a poll parish, and were authorized to receive the fund, and directed to apply it to the support of a congregational teacher of piety, morality and religion in the south part of T. forever, and, if it should be more than sufficient for that purpose, to apply the surplus to the repairs of the meeting-house, or such other pious uses as the society should direct: The society were duly organized, and received the fund, and became connected with a congregational church, previously united with another society, dissolved about that time; and for many years applied the fund to the support of a congregational minister at a meeting-house in the south part of T. which had been previously occupied by the former society. *Held*, that they might appropriate the fund to the support of a congregational minister provided by them at any place of worship in the south part of T., and that a congregational society, legally organized by the minority of said society, who continued to worship at the old meeting-house after its abandonment by the society, had no claim upon the fund.

A bill in equity, to restrain the misappropriation of a fund held by a corporation in trust, cannot be maintained against the trustees appointed by the corporation to hold and manage the fund, without making the corporation a party to the bill.

BILL IN EQUITY, filed on the 5th of December 1849. Hearing before *Dewey,* J. who made a report of the case for the consideration of the full court, the substance of which is stated in their opinion, drawn up by

MERRICK, J. The object of the present bill is to direct and enforce the appropriation of the income of a certain pecuniary fund, which is in the possession and under the care and manage-

ment of the defendants, to the support and maintenance of public worship in the religious society, called "The First Religious Society in Monterey," of which the plaintiffs say they are members.

The parties were heard upon the bill and answer. From the evidence then produced, the legal results and conclusions from which are presented in the report now before us, it appears that the fund, of which the defendants admit themselves to be in possession and to have the management, was raised by the voluntary subscription of many individuals, sometime previous to the year 1809. By the terms of the articles of subscription, the fund was to be applied "for the purpose of supporting a congregational teacher of piety and religion to supply the pulpit and perform the duties of a minister in what is called the south part of said town forever;" and it was stipulated that if the annual income arising from the fund should ever be found more than sufficient for the support of a minister, the surplus should be laid out to repair the meeting-house, or for such religious purposes as the society should agree. In the month of January of the same year, in a memorial addressed to the legislature of the Commonwealth, representing that they had raised by subscription the sum of four thousand dollars to be preserved as a permanent fund to aid in the support and maintenance of public worship, as stated in their articles of subscription, they prayed to be incorporated as "The First Congregational Society in the town of Tyringham," with the powers, privileges and immunities conferred by law upon parishes and other religious societies. Upon this petition, the subscribers to the fund, by an act, passed on the 16th of June, 1809, (*St.* 1809, *c.* 1,) were made a body corporate, with the rights of parishes; and, upon their legal organization, they and their successors constituted a poll parish The second section of the act authorized the corporation to receive and accept the fund which had been raised by the subscribers, and directed that the income of it should be applied to the support of a congregational teacher of piety, morality and religion in the south part of the town of Tyringham, forever; and if it should be more than sufficient for that purpose, that

the surplus should be applicable to repairs of the meeting-house, or such other pious uses as the society should direct. And by § 3 the society was required to make an annual appointment of trustees to manage its fund and take charge of its general prudential concerns.

Immediately after the passage of this act, the society was duly organized, and the money which had been raised by subscription was transferred and paid over to them, and trustees were legally appointed, with whom it was deposited, and to whose care and management it was confided.

It is conceded by the plaintiffs that the fund has been properly taken care of, and that the income from it has been lawfully applied and disposed of, ever since it was received by the society, until the close of the year 1848. They complain that subsequently to that time it has been perverted from the uses to which, according to the intendment and purposes of the original subscribers, and the provisions of the act of incorporation, it is legitimately applicable; and they pray the intervention of this court, to ensure by a proper decree its lawful appropriation, and to restrain the defendants from making payments under direction from the society for maintaining public worship in the new meeting-house, as will be hereafter mentioned, which is alleged to be an abuse of their authority.

. Previous to the year 1809, there was a religious society in the south part of the town of Tyringham, with which was connected a church, constituted according to the usages of the congregational denomination. It does not appear to have owned any real estate or to have possessed any property; but there was a building in that part of the town, since known as the old meeting-house, of which its members had the use, and perhaps the exclusive use, for the purpose of holding their meetings for public worship. Upon the organization of the First Congregational Society, the former society appears to have been abandoned and dissolved. It never acted in any way afterwards. The church, however, remained, and immediately became connected and blended with the new corporation. Without any known bargain or agreement, but apparently by the mere tacit

34*

acquiescence of all parties, the latter entered into the occupancy and use of the old meeting-house as it had been used before, and held meetings there from that time forward, until the year 1836. And during all the intermediate period it exercised the parochial powers conferred, and discharged the parochial duties imposed upon it. Ministers were duly called, ordained and settled, and provision was made for their support, and in aid of this object the income of its fund was applied and expended. After this time, the plan of its operations was essentially changed. It no longer exercised its merely parochial powers, but confined itself to the care, management, disposal and expenditure of the income of its fund, under the authority and according to the provisions of its act of incorporation. In consequence of this alteration in the conduct of its affairs and its method of operation, it was subsequently known and designated as the " Fund Society." Its plan, position and duties as a parish, were then assumed by a voluntary association, which embraced to a considerable extent the same persons who had been and were members of the Fund Society. It was called " The Religious Society of South Tyringham." It discharged the duties it assumed, called, settled and supported ministers, and maintained public worship until the year 1844. It was then given up and abandoned, being in fact superseded by the " Congregational Society of South Tyringham," which was another voluntary association, consisting substantially of the same individuals, but formed and organized as a religious society, under a warrant issued by a justice of the peace, according to law. Rev. Sts. c. 20, § 16. It was formed for the same purpose as its predecessors, and had the same objects in view. The ancient church united with it; and according to the usages of Congregationalists, they together gave a call in the month of June of the same year, to the Rev. Samuel Howe, to settle with the society as their minister. The invitation was accepted, and he became their pastor, and remained with and was supported in that relation by them, until after the filing of the present bill. The old meeting-house was used and occupied as it had been by the preceding societies which have been mentioned, and com-

tinued so to be constantly used as a place for public worship, until the year 1848. About that time, though before that year, several individuals, associated together, had caused to be erected in Monterey, on land which in the year 1809 was within the limits of the southerly part of Tyringham, a new meeting-house, nearly two miles distant from the old one, the use of which they offered to the Congregational Society. This offer was accepted; and the society voted in January 1848 that their minister, the Rev. Mr. Howe, should preach two thirds of the then ensuing year, in the new meeting-house. In the month of January in the following year (1849) they voted that he should preach there all the time. The vote in both instances was complied with, and in the latter year the old meeting-house was left by the society, undoubtedly with an intention permanently to abandon it.

The Fund Society has constantly kept up its organization and preserved its existence under its act of incorporation. It has always made an annual appointment of trustees. Every year since the year 1836, it has voted to appropriate and has actually appropriated the income of its fund to the support of the congregational teachers who have been from time to time the regularly ordained and settled ministers of the aforementioned societies. The defendants were the trustees for the year 1849. Under direction of the society, and in accordance with its votes, they paid one quarter part of the income of its fund for the first quarter of the year for and towards the support of the Rev. Mr. Howe, and in part payment of his salary. This last payment is the alleged misappropriation of which the plaintiffs complain, and from the repetition of which they pray that the defendants may be restrained.

The plaintiffs claim to be members of the corporation established by the act of 1809, that is, of the Fund Society, and to be interested as shareholders in the property belonging to it. With certain associates, after the Congregational Society voted in 1849 to have preaching exclusively in the new meeting-house, they formed and legally organized a new society, which they called the First Religious Society in Monterey. They repaired

the old meeting-house, which had fallen into decay, and made provision for the support of public worship there, by causing a congregational minister to be installed and settled as their pastor. And they contend that under this organization they are entitled to receive the income of the fund belonging to the Fund Society towards paying for the support of the teacher they have thus provided.

But it is very clear, that in this latter relation they have no such right. The "First Religious Society in Monterey," having been duly organized, is itself a body corporate, allowed and established by law. Rev. Sts. *c.* 20, § 1. It has rights of its own, and is altogether distinct from and independent of any and all other religious bodies or associations. The Fund Society was never charged with the duty of making provision for the support of the gospel ministry in other separate, distinct and independent parishes or societies. Nor was it ever authorized to make any such appropriation of its funds. On the other hand, it was not only empowered, but expressly required, (for such is the necessary consequence of the provisions of its act of incorporation,) to devote the income of its fund to the support of the religious teacher whom it should provide for itself. A refusal therefore to contribute aid to another distinct society, though worshipping in the place where it had formerly and for many years been accustomed to assemble for a similar purpose, affords no legal ground of complaint against it.

Nor was the payment to the Rev. Mr. Howe, under the circumstances already stated, for his salary for the first quarter of the year 1849, an expenditure in conflict with any of the provisions of the act of 1809, by which the subscribers to the fund were incorporated. The society which was thereby established was not only authorized, but explicitly required, to apply the income of the fund intrusted to it, to the support of a congregational teacher of piety and religion in the south part of Tyringham. This it has always faithfully done. It is conceded by the plaintiffs, and the facts are also fully proved by the evidence in the case, that the new meeting-house is located within the prescribed territorial limits; that the Rev. Mr. Howe is a con-

gregational teacher; and that the society over which he is ordained belongs to that denomination. A payment therefore to him for his ministerial services to the society and towards his support is not only a literal compliance with the provisions of the statute, but strictly in promotion of the special objects for which it was enacted.

The only ground upon which it has been urged that such an expenditure of the income of the fund is illegal or unjustifiable is, that public worship was not maintained in 1849 in the same house which was occupied by the Religious Society in the south part of Tyringham in 1809. To this consideration there is a brief but decisive answer. No such restriction was ever imposed upon the society. Its act of incorporation required that the income of the fund, of which it was charged with the care and management, should be expended in the support of a congregational teacher of piety, morality and religion in the south part of Tyringham. This was the only limitation, in execution of the trust it assumed, to which it was made subject. In the selection of a place, where the services of a teacher, who should receive that income towards his support, should be ren dered, the society was left entirely at liberty to act upon the legally expressed choice of its members. This is a power which belongs to every parish which is not restrained by some special provision. *Fassett* v. *First Parish in Boylston*, 19 Pick. 361. And the free exercise of that right involved no dereliction of duty or violation of law. The cases of *Baker* v. *Fales*, 16 Mass. 488, and *Stebbins* v. *Jennings*, 10 Pick. 172, relied on by the plaintiffs, concerned territorial parishes.

Upon a consideration of all the allegations of the plaintiffs, and of the evidence adduced in support of them, there does not appear to have been any misapplication of its funds on the part of the society, nor any failure to perform the obligations under which it is placed. Nothing is shown therefore upon which this bill can be maintained.

But there is an objection of a different kind to the maintenance of this bill, apparent upon its face, and which in its effect is insuperable. It cannot be supported for the causes

which it alleges, and for the objects it seeks to obtain, against the defendants alone. It shows that these defendants are the mere holders and managers of a fund which belongs to a corporation established by law, and that they have in all respects managed and conducted it in obedience to the orders and in conformity to the wishes of those whom they were bound to obey. The object of the plaintiffs is to obtain a conclusive decree, by which the future appropriation of the income of the fund belonging to the " First Congregational Society in the town of Tyringham " shall hereafter be regulated, directed and controlled. Yet that corporation is not made a party to the bill, and no opportunity is afforded to it to object to the proposed course of proceeding, to protect its property, or to vindicate what it may claim to be its right. As the owner of the fund, charged with its preservation and with the legal disposition of all its income, and responsible for every thing which is done concerning it, that society is the party to be questioned and complained of for all alleged mismanagement. If it has violated its duty as a trustee, its action may be controlled and its errors corrected. It is accountable for the conduct and proceedings of those whom it appoints as its agents, by whatever name they may be called, whether servants, directors or trustees, and may hold them responsible to itself for their acts and conduct. But such agents are not bound or liable to answer to others who complain that their principal has departed, or is departing, from the line of legal duty, in directing and prescribing the objects and purposes to which the income of its own fund shall be applied. Therefore, even if it were made to appear that the income had been ordered by it to be applied to purposes, not warranted by the act of incorporation, nor in furtherance of the object and design for which a fund was raised and established, a bill in equity prosecuted to obtain a judicial decree to regulate its future use, and control its future appropriation, could not be maintained against them, without making their principal, the First Congregational Society in Tyringham, also a party to it.

*Bill dismissed.*

*I. Sumner & J. E. Field,* for the plaintiffs.
*F. Chamberlin & J. Branning,* for the defendants.