Shaw, C. J.
This is an information filed by the attorney of the commonwealth, for the county of Suffolk, on the equity side of the court, in the name and behalf of the commonwealth, at the relation of Daniel Weld, a member of the Hollis street church, and of the proprietors of the Hollis street meetinghouse. The suit is brought against Samuel May and Eleazer Nichols, deacons of the Hollis street church, John Pierpont late pastor of the church and society, and the New England bank and Atlantic bank of Boston.
At the opening of this hearing, it was objected, on the part of the respondents, that the suit could only be prosecuted by the public prosecutor personally; and that if it was rightly commenced by the attorney of the commonwealth for Suffolk, which they denied, he could only appear personally; and that the gentlemen, here conducting the cause as counsel for the relators, could not be heard. This objection was overruled, and upon reconsideration, I think rightfully. The authorities cited, I am satisfied, show that such a suit by the public prosecutor, in the name of the commonwealth, for establishing and sustaining charitable trusts, is, in truth as well as in form, a suit to protect public interests; and that it must be prosecuted with the sanction of the public prosecutor, whose duty it is to see that the public interests sustain no detriment, and to proceed in the prosecution or stay proceedings, as a just regard to these interests may require. It follows, therefore, that this proceeding is not to be considered as the suit of the relators; nor can the relators, of their own motion, or in their own names, take any step in the cause, or be heard as parties. Courts of equity have also suggested, and the suggestion is certainly entitled to great weight, upon the most obvious considerations of fitness and propriety, that the attorney-general or public prosecutor ought not to appear as counsel for adverse parties in such a suit. The court and the public have a right to the countenance and responsibility of the law officer of the government, in di *338 recting and regulating the suit. But considerations requiring the public prosecutor to be regarded as a party do not require him to act personally as counsel; but like every other party in a civil suit, he may appear and act by his attorney and counsel. Attorney-General v. Barker, 4 Mylne & Craig, 262; Attorney-General v. Wright, 3 Beav. 447; Attorney-General v. Ironmongers Co. 2 Beav. 313, 328. The counsel here being authorized by the attorney for the commonwealth, he is properly represented.
Another question, somewhat important as a practical one, in this case, was moved; that is, whether the attorney of the commonwealth for this county could institute such a prosecution as this, purporting to be an information to establish and cony into effect a charitable gift or donation.
The power to institute and prosecute a suit of this nature, in order to establish and cony into effect an important branch of the public interest, is understood to be a common-law power, incident to the office of attorney-general or public prosecutor for the government. Since the passage of the act (St. 1843, c. 99,) abolishing the office of attorney-general, this beneficial power would fail, and the rights of the community dependent upon it would be defeated, for want of remedy, if this power did not survive in the several local public prosecutors ; a conclusion, to which the court ought not to come unless it is a necessary one.
The authority mainly relied on in this case is the statute oi 1843, § 99, by which the office of attorney-general, as then constituted and established by law, was abolished. This statute provides, that the commonwealth’s attorney for the county of Suffolk, when required by the governor or either branch of the legislature, shall appear in all causes, in which the commonwealth may be a party, or be interested. And in the present case, it is stated in the bill, that the attorney appears upon the requisition of the governor. I have great doubts w hether such a requisition would authorize this prosecution. I have no doubt, that the establishment of a grant or donation for purposes of a general charity, in a suitable and proper cas» for the actioi of a court of equity, is a case in which the com *339 monwealth is interested. But by the statute referred to, the prosecuting officer would not proceed, in such a cause, on his own sense of duty, and on his own responsibility, by virtue of his office ; he must first be put in motion by an act of the executive, or of one branch of the legislature. Parties seeking this beneficial remedy must first apply to the governor, or to one branch of the legislature; and if there is a power to grant such application, there must be a power to refuse it; and, of course, there must be an inquiry and adjudication, in order to determine, whether the application discloses a fit and suitable case for commencing a prosecution. Such a power would seem to be contrary to the spirit, if not to the letter of the declaration of rights, art. 30, which declares, that, in the government of this commonwealth, the legislative department shall never exercise the executive and judicial powers, or either of them, &c. But it appears to me, that the statute of 1843, c. 99, was framed with another purpose. The Revised Statutes had provided, (c. 13, § 30,) that the attorney-general, after enumerating various other duties, should, when required by the governor or either branch of the legislature, appear for the commonwealth, in any court or tribunal, in any causes in which the commonwealth might be a party or interested.
The statute of 1843 having abolished the office of attorney-general, most of the duties of that officer were distributed and vested in the district attorneys, as the local prosecuting officers* But some of these duties, being of a general nature, and not local, it was necessary also to provide for them. There might be occasions, in which the commonwealth would require the appearance of an attorney, in courts and tribunals out of the commonwealth, as before the supreme court of the United States; or the respective branches of the legislature, each having a separate jurisdiction to punish for contempt or breach of privilege, might have occasion to prosecute and defend suits. The statute in question was, I think, intended to provide, that these duties should devolve on the common *340 wealth’s attorney for the county of Suffolk, being resident at the seat of government.
But it appears to me, that the authority of the attorney to proceed in this case does not depend on that statute. The Be vised Statutes had already made provisions bearing upon I his subject. By c. 13, § 37, it was directed, that an attorney for the commonwealth, in the county of Suffolk, should be appointed, who, in addition to the duties specially required of him by law in that county, should perform like duties therein as were required of district attorneys in their respective districts. By § 38, it was provided, that the district attorneys, in their respective districts, should appear for the commonwealth in all cases, criminal and civil, in which the commonwealth should be a party or be interested; and they should, also, within their respective districts, perform all the duties which the attorney-general was or might be authorized to perform, and which were not required to be done by him personally.
I am strongly inclined to the opinion, that the filing of an information in equity is not a duty required to be done by an attorney-general personally, within the meaning of the above provision; it is a power incident to the office of public prosecutor for the time being, whether an attorney-general or solicitor-general, and by the above clause was vested in the district-attorneys, in their respective districts. Had it been otherwise, I think the legislature, in abolishing the office of attorney-general, would have made more ample provisipn for upholding and maintaining powers so highly useful to the commonwealth. If this proceeding was one, which the commonwealth’s attorney for this county had power to commence ex officio, I cannot perceive that the bill is defective, because it recites an authority and requisition of the governor, though such requisition was not necessary to its validity.
Supposing the prosecution rightly commenced, in point of form, and by competent authority, the question arises, whether there is such a case made out, as can be sustained in a court of equity.
I. In order to determine whether this court has jurisdiction, we are to inquire whether the case discloses a trust. It is *341 not enough to find, that the case involves questions respecting property or funds held for purposes of charity or benevolence; but whether they are so held and placed by any form of trust. If they are, then the court has jurisdiction of the cause, under the general provision giving equity jurisdiction in all suits and proceedings for regulating and enforcing the execution of trusts. Rev. Sts. c. 81, § 8. And although courts of equity may have a larger jurisdiction over charities and charitable donations in England; yet, this court derives all its equity jurisdiction from statutes, and no statute has extended its jurisdiction over charities, beyond the cases of settlements and donations upon trust for charitable uses and objects.
But it has been held, in courts of a larger equity jurisdiction, that the court will not take jurisdiction in the case of a misapplication of funds to purposes not corporate, on the ground of trust, except in cases of corporations holding to charitable uses. Mayor, &c. of Colchester v. Lowten, 1 Ves. & B. 226. Nor will it interpose to prohibit an alleged usurpation of powers by a corporation. Attorney-General v. Utica Ins. Co. 2 Johns. Ch. 371.
It is no doubt true, that having jurisdiction over all trusts for charitable purposes, when that jurisdiction once attaches, by bringing a case under the head of trusts, this court will administer its powers in a manner and upon rules somewhat different from those which are applicable to private trusts, and in the same liberal manner, to carry into effect the purposes of the trust, as a ,curt of chancery. It will, I have no doubt, supply many defects, which would be fatal in the case of private trusts. When the object is' manifest, but no trustee is named, the court will appoint a trustee to take and hold the estate; it will aid and assist the trustees in carrying the trust into effect, at the suit of any party interested, when the objects are general and indefinite, or even impracticable, if the objects are within the general intent; and if the trust is general and public, for classes of objects not named or capable of specific designation, at the suit of the attorney-general.
With these views of the jurisdiction of this court, we are to look at the bill and see what case it states. It purports to *342 be brought at the relation of Daniel Weld, one of the members of the Hollis street church, and of the proprietors of the Hollis street meeting-house.
The bill sets forth, that before the filing of the same, there was, and of right still ought to be, a large fund amounting to $10,000, invested, &c., and which of right ought to be vested and held by May and Nichols, deacons of the church, in their capacity, as a body corporate, for taking and holding in succession all grants and donations made to them, or to the church, or to the poor of the church; that the same was created by voluntary contributions and gifts, made by members of the church and others, for the purposes of defraying the expenses to be incurred by the church in celebrating the ordinance of the lord’s supper, in sending their pastor and delegates to attend ordinations, and in some other inconsiderable matters of expense ordinarily incurred by churches similarly situated; and that the fund has been increased by accumulations of interest, the use to which it was devoted not exhausting the whole income.
This is the only statement given in the bill of the nature, character, and objects of this fund. It is true, that it is stated in the answer, that a part of the fund was derived from a bequest of a small sum by governor Dummer, in trust to pay the income to the pastor for the time being; that a small sum ¿ame from the gift of Mrs. Eleanor Davis, which she desired but did not direct might go towards a fund, the interest of which should be for the poor ; and another portion of the fund is said to be derived from the proceeds of the sale of Franklin hall, for the purpose of building a parsonage; but how or by whom given is not stared. The answer further states, that these sums, though invested with the general fund, are yet distinguishable in the accounts, and have been and are still held applicable to the purposes for which they were appropriated, and are not included in the sum proposed to be granted to Mr. Pierpont. But I have not thought it necessary to pursue this matter more into detail; because no statement is made in the bill respecting any such special and separate appropriation, and no issue is taken thereon.
*343 The bill then sets forth, that a part of the fund consists of twenty shares in the New England bank and thirty shares in the Atlantic bank, amounting in value to $5000 and upwards; that certain persons, being members of the church, have undertaken to give this stock to Mr. Pierpont, formerly pastor of the church, (but who had ceased to be so,) as an expression of their unabated confidence, respect, and attachment. The bill then alleges, that Nichols, one of the deacons, protested against this grant; that the proprietors of the meeting house did the same by their committee; and the prayer of the bill is, that the court would interpose to restrain the respondent May from making such transfer, and the banks from permitting it to be made. The bill charges, that there was no meeting of the male members of the church ; that the donation was nor voted or assented to by a majority of such members ; and that the male members of the church, for the time being, even by unanimous consent, could not change the uses of the fund; nor could the same be done, but by a decree of this court. These are substantially the statements and charges in the bill.
As this prosecution is promoted at the relation of the proprietors of the Hollis street meeting-house; as it appears by the bill that they, by their committee, have protested against this grantand as one of their members, on their behalf, has given security for the costs in this case ; it becomes necessary 4"o inquire, what is their interest and their relation to the fund in question.
It appears by the proofs, that the proprietors of the Hollis street meeting house constitute one of the oldest congregational religious societies in this city, having been established as early as 1732, and long under the pastoral care of the celebrated Dr. Byles. This was, no doubt, one of the congregations contemplated by the preamble to § 3, of the provincial statute of 1754; which, first reciting that the several congregations in the town of Boston, and some others under like circumstances, were not by law enabled to raise money for the support of the ministry and public worship, proceeds to furnish a remedy. The truth is, that these societies were not *344 like other parishes and precincts generally, territorial and local, and never were so, from the first settlement; so that the general laws, applicable to parishes, did not and could not apply to them. But in 1809, an act of the legislature was passed declaring and confirming the incorporation of the proprietors of Hollis street meeting-house as a body politic, with various enabling clauses. These proprietors are, therefore, now to be regarded as a regularly incorporated religious society, with the rights, privileges, and relations, belonging, by law and usage, to such societies in Massachusetts.
It appears, also, that from its first establishment to the present time, there has been in this religious society a church, consisting of members, separated and associated by covenant, recognized as the church of the society. It is stated in the bill, that shortly after Mr. Pierpont’s settlement, he began to preach and otherwise to make known and declare, that all persons have a right to participate in the ordinance of the lord’s supper, from which none should be excluded; that the distinction, which existed in congregational societies generally, between the members of the separate body called the church and those who were not such members, was not according to the new testament; and that he invited all to join, and many persons not under church government joined with the members of the church, in celebrating the lord’s supper ; in consequence whereof, the separate body called the Hollis street church had fallen into much decay, and its members became few in number, and their meetings infrequent and irregular; for evidence of which the relators referred to the records and other proofs.
This statement is denied by the answer, but the respondents admit, that, for a time, Mr. Pierpont advocated the free admission of all persons to the lord’s supper, and did extend his invitations accordingly, until the year 1839; when the church passed a vote restricting such invitations to members of other churches. But the respondents deny, that the separate body called the Hollis street church has fallen into decay, oi that their meetings have been few or irregular; and aver that no person has been received as a member of the church except under covenant.
*345 But it appears to me, that though other persons than covenant members should be invited to partake, and should thereupon unite with the members in the ordinance of the lord’s supper, such persons would not thereby necessarily become members of the church. But on reference to the records, it appears that there have been regular admissions to the church, from year to year, to the present time, according to the usages and practice of congregational churches.
What then is the relation between the proprietors of the Hollis street meeting-house and the Hollis street church ? It is obviously the same which subsists, and from an early period in the history of the country has subsisted, between religious societies and the churches of such societies. They are recognized as associated bodies ; acting respectively under certain laws and usages; each of them exercising certain powers and privileges; and distinct from each other but necessarily united.
The religious society is a corporation known in law, capable of taking and holding real and personal property, and charged with the duty of maintaining public worship and religious instruction. The church is a voluntary association, consisting of the whole or some part of the members of the society, united together by covenant or agreement, according to usages well known and generally recognized, for the purpose mainly of celebrating the Christian ordinance of the lord’s supper, and for mutual discipline, in regular church order. The church is a voluntary association ; not a corporation nor a quasi corporation, in the usual sense in which those terms are used; but like a corporation in respect to its power to act by votes and by majorities.
It may be a question, then, how such a voluntary association can act, subsist, and enjoy rights and privileges; or, in other words, how its certainty, identity, and perpetuity can be known and established. The answer is, that it subsists and acts, and possesses these qualities, because it is incident to, and inseparably connected with, and dependent on, a body, which has certainty, identity, and perpetual succession by an act of incorporation.
The identity of a church is determined by the identity of *346 the incorporated religions society within which it is gathered; and such church, although a merely voluntary association, has perpetuity through its connection with a corporation which has perpetual succession. If, therefore, all the members of a ■ church should die, or withdraw, any number of the members of the same society, forming themselves into church order, for the celebration of the ordinances, either by the spontaneous movement of such members themselves, or under the advice, and at the call of neighboring churches, such association would be the church of the society, identical with the church formerly subsisting; and upon the orderly choice of deacons, they would be competent to take and hold property given to the church, and would be the regular successors of any former deacons ; and if need be, might maintain suits for the recovery of any such property. Baker v. Fales, 16 Mass. 488; Stebbins v. Jennings, 10 Pick. 172; Page v. Crosby, 24 Pick. 211. But although a church is thus capable of acting as an aggregate organized body, having the qualities of certainty, identity, and perpetuity, yet not being a corporation, it could not take and hold property prior to the provincial statute of 1754, for securing and rendering more effectual grants and donations to pious and charitable uses. This act provided, that the several protestan! churches, not episcopal, should be deemed so far bodies corporate, as to take in succession all grants and donations made to their several churches, to the poor of their churches, or to them and their successors, and to sue and defend all actions touching the same. This was reenacted by St. 1785, c. 51, and in nearly the same terms by the Rev. Sts. c. 20, § 39. Now, as neither of these statutes designates what constitutes a church, or who are the deacons of a church, or how they are to be chosen and qualified to take and hold estate in succession; all these inquiries are necessarily left to usage, to the well known, established, and recognized customs of the country, which render these terms intelligible and significant. This statute was not necessary to give effect to a grant to a deacon of a church, if he was living at the death of the testator; because a gift may be made to one by a description, as well as by name, if the per *347 son designated thereby is certain. A gift to the treasurer of the Humane Society, supposing it not to be incorporated, would be good; but the fact, that persons are associated under that designation, and that they have a treasurer, would be a fact to be established by proof; and if the individual was thus identified, he would take in his personal capacity, by such designation, as descríptio persanes. But the specific objects of the statutes referred to were to enable the deacons to take and hold property, not in their natural capacity, descendible to their heirs, but in succession, in a corporate capacity ; and also to take and hold not only the property given to them in terms, but property given in terms to the church, or to the poor of the church, or in any such terms as clearly to indicate that it was intended as a grant or gift for the use of the church. One other provision runs through the acts, which it is material to notice; which is, that though the property is vested in the deacons, yet they cannot alienate real estate, without the consent of the church, or a committee of the church appointed for that purpose; and all churches are authorized to appoint a committee for the purpose of settling the accounts of the deacons, and if need be to commence any suit, in the name of the church, against the deacons or other church officers, touching the same.
Such being the relations of the society and the church to each other, and such the powers and faculties of each, the question is, whether the church, or the deacons or other officers of the church, are trustees of their funds for the society; and in my opinion they are not. These funds are exclusively church funds, raised for church purposes, distinct from those of the parish or religious society, and subject to the full disposing power of the church. I am aware, that in the case of Baker v. Fales, it was intimated, that the parish had an interest in the church funds; but the intimation was made expressly on the ground, that the lands out of which the fmids grew were given for the support of public worship, which is a parish purpose, and not a church purpose; leaving the point now in question wholly untouched, when the property is held solely for church purposes. I do not mea a lo say, that a *348 church, having the full jus disponendi of its funds, may not apply a part of those funds to aid in-the support of public worship ; to retain and support a poor, decayed, and aged minister and for other objects of a strictly parochial nature, but yet homogeneous with those, which are within their more peculiar province. But what I mean to say is, that, in my opinion, the parish have no right, legal or equitable, to require the church so to appropriate their funds, and have no standing in a court of law or equity to assert or enforce such a claim. Nor is the mere possibility, that the members of the society, or some of them, may become members of the church, an interest which can afford the society such a standing.
If, however, it were otherwise, if the society had such a beneficial interest, as cestui que trusts, in the church funds, this interest would be one held by the society, in their corporate capacity, which the society in their own name and right, as a corporate body, might enforce in equity; but it would not be such a trust for general charity, as would require or warrant the interposition of the public prosecutor. I therefore come to the conclusion, that the claim of the proprietors of the Hollis street meeting-house to any interest in these funds may be laid entirely out of the case; and that the claim of the public prosecutor to charge this fund as a charitable fund with any trust for these proprietors cannot be maintained.
II. Supposing this fund not to be held in trust for the society or proprietors of the Hollis street meeting-house, we are next to inquire, whether the case discloses any other trust to which this property is subject.
In looking at the church and the deacons together as one aggregate body, it appears, that the church holds its property as corporate property is held, not in trust, but in its own right, to be appropriated to the uses and purposes for which such aggregate body is constituted. We are then to inquire, whether they are not for this purpose to be taken together as one aggregate body, in the nature of a corporation. And, in this view, it is again proper to refer to the considerations already stated, to indicate the nature and capacities of a church, as an aggregate body, not a corporation, and its relation to. ana connection with, a parish or religious society.
*349 We have already seen, that the members of a church are not a corporation legally capable of taking and holding pro perty; but the deacons are made a corporation with perpetual succession for that purpose. Ordinarily, the legal title to property carries with it the power of disposition and alienation; but this may be limited and restrained by law, and in the case of deacons, we think it is so by various provisions. We have already remarked, that the real estate of a church cannot be alienated by the deacons, though the legal estate is in them, without the consent of the church, or of a committee of the church appointed for that purpose. I think the same rule extends to personal estate. In the first place, the members of the church constitute the body, for which the benefit as well as the management of the property is intended, and the gift may be in terms to them; they and their interest and existence are the moving cause to the grant or gift; and because they are a body varying, from time to time, in the members of which it consists, the deacons are vested with corporate powers, simply to take and hold property, but not to dispose of or manage it.
We have already adverted to the consideration, that what a church is, who are deacons, and the like, are questions, which are not settled by any express provisions of law, but left to be determined by established usage. This is further sanctioned by the provision of the Rev. Sts. c. 20, § 3, following in this respect almost in terms St. 1834, c. 183, § 1, and that again following St. 1799, c. 51, that churches, connected and associated with parishes and religious societies, shall continue to have, exercise, and enjoy their accustomed privileges and liberties respecting divine worship, church order and discipline, and shall be encouraged in the peaceable and regular enjoyment and practice thereof.
Now, although this looks mainly to ecclesiastical action, to measures of discipline pro salute animce, yet I think it goes further and sanctions established usage, in regard to church order. But the appointment and removal of deacons are within the scope of church order; and, therefore, though the church does not directly vest the property in them, or take it from *350 them, yet it does clothe them with a capacity, or deprive them of the same, by the confining or withdrawing of which, the property vests in them, or is divested from them, by the force of law.
Further, by the Rev. Sts. c. 20, § 44, churches are authorized to enoose committees, for the purpose of settling the accounts of ihe deacons and other church-officers, and, if necessary, to commence suits against them. In the original act of 1754, the corresponding power was to call the deacons to account. These provisions strongly imply, that the deacons are official persons, designated by law to supply the want of capacity in the church to be the legal holders of property; and that in all other respects, the church act in regard to property, as they would do if incorporated with power to hold and alienate their property.
Lastly, the statute provision above cited recognizes and confirms the accustomed privileges of churches respecting church order. Now, it is in proof, in the present case, and we think the usage is so notorious, old, and established, that it might be taken notice of by the court, that in all congregational churches, the management of their secular affairs is in a majority of the male members, assembled and present at a meeting called in the usual mode.
The result is, that although the legal interest is in the deacons, the jus disponendi, both as to real and personal property, is in the church acting by a majority of the male members present at a regular meeting. The church and the deacons together, therefore, take and hold the property in their own right, with a full and unlimited power of disposition, subject to no trust, and especially subject to no trust for general charity, which would render them amenable to this court, upon an information in equity by the public prosecutor.
III. If property legally in the hands of the deacons, as the officers of the church, may be regarded as held in trust for the church, or the members of the church, and this suit may be regarded as a suit against the deacons, for the purpose of enforcing that trust, for their benefit, I think it cannot be maintained for several reasons: —
*351 1. This bill does not appear to be brought at the instance of the church, or of a majority of the male members of the church; but at the relation of one member only, Daniel Weld. And although the relation of one person would be sufficient to warrant the suit of the public prosecutor, to enforce or carry into effect a trust for general charity, it is not so where the trust is for a person or body capable of acting for itself.
2. And this leads to another objection; if this property is regarded as property committed to the deacons in trust for the church, or the members of the church, it is a trust growing out of a particular relation created by law, and is a specific trust, which the persons entitled to are capable of enforcing. Charitable funds, to be administered under the direction of a court of equity, are such as are supplied from the gift of the crown, or of the legislature, or of private individuals, for a legal, public, or general purpose. Jeremy, Eq. J. 247. And it is not enough, that one of the purposes of a church fund is the relief of the poor, to make it a charitable fund; but such relief is to be had only under the power of disposition vested in the church, who have the entire disposition, and of course the power to relieve at their discretion, and according to their own judgment of the objects and of their necessities. The controlling power of the court over charities does not extend to a charity regulated by governors under a charter, unless they abuse their trust in regard to the revenues. Attorney-General v. Foundling Hospital, 2 Ves. Jr. 42. A church, recognized as a body having power to administer its funds for particular purposes, and among those purposes to relieve such poor persons as they may judge fit, resemble, in this respect, a body constituted by charter to administer charitable relief.
3. But suppose the deacons hold the property in trust for the church, this suit cannot be maintained by the public prosecutor, because the church have a complete remedy in their own hands. They may remove the deacons, and appoint others; by which the powers of alienation in the present deacons will be divested, and the property vested in those newly chosen. They may appoint a committee to call the deacons to account, and if necessary to commence and prosecute a suit against *352 them in the name of the church. In this way, any breach of their trust by the deacons, to the injury of the church, may be prevented or redressed without the aid of the commonwealth by its public prosecutor.
IV. But, it is contended on the part of the complainant, that at all events, it was a breach of trust, on the part of the respondent May, to invest the funds in his own name, and that there must be a decree against him, requiring him to invest the funds in the names of himself and the other deacon. It is stated in the bill, and admitted in the answer, that the funds are invested in the name of May, as treasurer of the church, and that they are capable of being separated and identified. I doubt both the correctness of the position, that such an investment is necessarily a breach of trust, and the conclusion drawn from it, that a decree must be passed upon this information, requiring May to invest the funds in the names of the deacons.
If we have taken the right view of the powers of the church and of the deacons, the latter are made by law the mere legal depositories of the legal estate; the full power of management and disposition of the funds being in the body of the church, acting by a majority of male members. In this capacity, I do not know why they might not choose other officers, and charge them with particular duties, in regard to the moneys and funds; and there might be a fitness and convenience in doing this, where the deacons are frequently changing. The law so frequently cited, Rev. Sts. c. 20, § 44, contemplates the appointment of “ other officers ” to offices of pecuniary responsibility, by providing that suits may be brought against such “ other officers ” by a committee, when necessary.
So far as the church could sanction the election of one of their deacons, as treasurer, and by so doing sanction his acts in investing their funds in his own name, as treasurer, I think they have done so by annually electing him for a long series of years, and by auditing and accepting his accounts in that capacity.
But whether this is so oi not, I am satisfied, for the reasons *353 stated under the last head, that if such an investment is a breach of trust, as against the church, they have never remonstrated, or even requested the treasurer to alter it; and it is a breach of trust, for which they have the remedy in their own hands, and for the redress of which no decree can be made in this suit, which is instituted and prosecuted by the public prosecutor for the enforcement of a public charity.
I have not thought it necessary to consider, at large, several questions, to which much of the argument of counsel, and most of the evidence taken as to matters of fact, have been directed; namely, what persons particularly were members of the church, whether the meeting was duly summoned, whether two thirds of all the members assented to the vote passed June 9th, malting the grant to Mr. Pierpont; because, if the court has no jurisdiction over the matter, as a case of trust to charitable uses, these questions do not properly arise, and cannot be settled in this suit.
It may be proper, however, to remark, on this part of the case, that if the disposing power over their funds is in the church, as a voluntary association, such power is to be exercised by a vote of a majority, at a meeting duly summoned. If that majority choose to make their act depend upon the assent of two thirds of the whole number of members, they no doubt have a right to do so; and if the validity of their grant depends on that alone, the fact of the assent of two thirds is necessary to give it validity, and to warrant the deacons in making the transfers.
But if a simple majority, at a subsequent regular meeting, declared by their vote that the assent of two thirds had been given, and thereby confirmed the grant, this would make it good, either by way of estoppel, or as a waiver of the condition.
Another obvious remark is, that, if the deacons are the legal depositories of these funds, with a liability to account for them, and the power of disposal is in the members of the church, acting by a majority; it behooves the deacons, at their peril, to see that persons professing to act as members of the church are such, and do in fact constitute a majority; because *354 without this they would not be warranted in transferring the funds.
But, still, if, in the particular transaction which is the subject of this suit, namely, the grant to Mr. Pierpont, persons have claimed to act, and have acted, who were not members of the church, whatever the remedy of the rightful members of the church may be, it cannot be sought in this process, on the equity side of the court, by an information by the public prosecutor. Bill dismissed.
The complainant thereupon excepted to tile order of the judge, directing the bill to be dismissed, and appealed therefrom to the full court, assigning as reasons for the appeal, that the judge, in the opinion upon which the order was founded, ruled and determined: —
1. That the funds and property set forth in the bill, and alleged therein to be held to religious and charitable uses, are not held by the deacons of the Hollis street church in trust, but by the deacons and the church as an aggregate body, as corporate property.
2. That said funds and property are held by the deacons and church, as an aggregate body, in their own right, with a full and unlimited power of disposition, subject to no trust, and especially subject to no trust for general charity, which renders them amenable to this court upon an information in equity by the public prosecutor.
3. That if the property may be regarded as held in trust by the deacons for the church, or members of the church, for the purposes set forth in the bill, this suit cannot be maintained at the relation of any memberoof the church; but that the same can only be instituted at the instance of the church, or of a majority of the male members of the church.
4. That although one of the purposes or trusts, for which the property is held, is to apply the same to the relief of the poor, according to their judgment, yet that does not constitute it a charitable fund, within the controlling power of the court over charities.
At the hearing before the full court, certain questions of *355 fact, which did not appear to have been adjudged or to have entered into the decision of the cause, on the former hearing, were argued without objection, and were considered by the court. The evidence relating thereto, consisting of votes of the church passed in 1813,1829, and 1833, is stated in the opinion.
B. E,. Owrtis and S. Bartlett, for the complainant.
G. G. Boring and S. E. Sewall, for the respondents.
The opinion of the court (Fletcher, J., not sitting in the cause) was delivered by
Wilde, J.
This is an information filed by the commonwealth’s attorney for this county, in the name and behalf of the commonwealth, to restrain the Hollis street church and the deacons thereof from the misapplication of a trust fund alleged to be established for charitable uses and purposes. At a hearing of the case before the chief justice, upon the information, answer, and evidence, two material objections were made to the maintenance of the suit, both of which were sustained, and thereupon the information was ordered to be dismissed; and to this decision the counsel for the complainant excepts, for the causes stated in the bill of exceptions.
The first objection sustained by the judge was, that the fund alleged to be held in trust for charitable uses was not so holden, but was the property of the church; and if so, that this, court as a court of equity had no jurisdiction, although the fund had been established by donations for charitable uses. The second objection was, that if this fund was held in trust, it was not held for such a general charity, as would authorize this suit, but for such uses and trusts only, as could be enforced by the church; and that if the trustees should misapply the fund, or any part of it, they would be responsible only to the church.
In support of the information, it is contended by counsel, that the fund, from which the grant to Mr. Pierpont was to be paid, was a fund which had been appropriated to some public charity, or had been so appropriated that it ought to be held in trust, without diminution by the church, in perpetuity, the church having the right only of disposing of the income. *356 Whether this fund has been so appropriated, is a question of fact to be decided on the evidence ; and if it distinctly appears, that it has been so decided by the judge before whom the cause was heard, no exception to the decision can be sustained.
By the Rev. Sts. c. 81, § 12, it is provided, that when this court shall be held by any one of the justices, the court shall have and exercise all the power that is not expressly reserved to the full court when held by three or more justices ; and the decision of questions of fact is not so reserved. But as exceptions were allowed to the decision of the judge of several questions of law, and it does not appear, that the case was decided on the questions of fact, which have now been argued, and without objection, we have examined and considered the evidence to which we have been referred by the complainant’s counsel, together with that part of the respondents’ answer which is responsive to the bill.
It is admitted in the answer, that a part of the fund has been appropriated, by the donors thereof, to specific uses and purposes, which the defendants have no right to apply to the payment of the donation to Mr. Pierpont; nor have they any intention so to apply it, the remainder of the fund being amply sufficient to pay the same. And this remainder of the fund, the defendants aver in their answers, is the private property of the church, to be used and appropriated by them according to their own will and pleasure, for their own exclusive purposes and uses, without any accountability to ■ any person or persons whatever.
This answer is responsive to the bill, and is decisive for the respondents, unless it is controlled by the evidence relied upon in support of the bill. That evidence is contained in the records of the church, and the complainant’s counsel contend that it is inconsistent with the answer. They principally rely on two votes of the church, one of which was passed in the year 1813, and the other in 1829. The first is as follows: “ Whereas deacon Brown has informed the church, that the balance of the donation of the widow Eleanor Davis to this church, added to the small sums which have been accumulat *357 ing for a number of years from the contributions on communion days, do now amount to $ 500, with which a church fund may be begun ; therefore, voted, that the deacons be a committee to loan said money according to their discretion, provided the loan be not upon real estate.”
The second vote, in 1829, was, “ that the collection usually taken up in this church after the celebration of the lord’s supper be hereafter discontinued.” This vote passed on the proposal of the senior deacon, principally for the reason, that there was no necessity for the collection, as a means of furnishing the table with the elements ; since the regular income from the present funds would be sufficient; and, with other sources of charity more than sufficient, to supply this want, and at the same time to meet the claims of the poor commu nicants upon the charities of their brethren.
We are of opinion, that nothing contained in these votes, taken in connection with the proceedings of the church, as they appear by the records, can be construed as an appropriation of the fund in controversy exclusively to any specific uses and objects, or to take away the right of the church to dispose of the fund as well as its income.
By the first vote, the deacons were appointed to loan the money then belonging to the church, at their discretion, provided the loan should not be made on real estate ; and this is declared to be for the purpose of beginning a church fund; but how that fund was to be appropriated, or whether it was to be permanent or not, is neither expressed nor intimated; and the subsequent proceedings of the church are opposed to the supposition, that the fund was ever intended to be appropriated exclusively to any specific uses and purposes; for until 1815, the poor of the church and society were from time to time relieved from the fund, which relief has ever since been discontinued.
Nor is an inference to be drawn from the vote and proceedings of 1829, that any appropriation of the fund was then made. The only objects, alluded to by the senior deacon, for which the fund was wanted, were the furnishing of the table with the elements, and the claims of the poor communicants *358 upon the charity of their brethren ; but no mention was made of defraying the expenses of sending the pastor and delegates of the church to attend ordinations, and yet these expenses have since been paid from the fund. And in 1833 the following vote was passed : “ Voted, that this church will hereafter be at charges for its delegations on ordaining and other councils, and that the treasurer be authorized to pay them.” So in 1845, by a vote of the church, $200 of the income of the fund were paid for the relief of the sufferers by the fire at Pittsburg.
And upon the whole record nothing appears, even independently of the answer, sufficient to prove that the fund in question has ever been appropriated to any public charity, or has been so appropriated as to deprive the church of the disposition of the principal of the fund as well as of the income.
And we all concur in the opinion of the chief justice, that this right of disposition of the fund is vested in the church alone ; and whether it be held by the deacons in trust or not, no disposition of it can be legally made without the consent of the church.
If then the transfer of stock to Mr. Pierpont was made without such consent, as alleged in the bill, it is clearly not a case which authorizes the intervention of the public prosecutor; and no decision of that question, in this suit, would be binding on the church. If their rights have been violated, they may have redress in a suit in their own name against the respondents, which they may commence and prosecute by a committee chosen for that purpose, by virtue of the Rev. Sts. c. 20, § 44; and since these exceptions have been argued, such a suit, it is understood, has been commenced by the church, and is now pending. We are therefore of opinion, that whatever right the church may have to defeat the transfer of stock to Mr. Pierpont, it cannot be decided in this suit.
This being the opinion of the court, the other exception to the ruling of the judge, as to the question of jurisdiction, is immaterial, and has not therefore been considered.

Exceptions overruled and bill dismissed.

 The office of attorney-general was restored, after the filing of the information in this case, by St. 1849, c. 186.