HOLT & a. v. DOWNS & a.

An unincorporated society, claiming to be a church, and engaged in the lawful promotion or defence of religion, is a church whose deacons may be a corporation, under Gen. St., c. 139, s. 6.

An indissoluble union of a church and parish of the orthodox Congregational denomination is not established by law, is contrary to Congregational principles, and is not shown by a long continuance of the ordinary Congregational connection of church and parish.

The proviso of the sixth article of the bill of rights, which reserves for religious societies the exclusive right of electing their own public teachers, does not confer upon a parish the right of electing the public teachers of a church connected with the parish.

A majority of the members of an orthodox Congregational church, not shown to be maintaining the organization of that church according to its method of procedure, are not legally presumed to be the church.

TROVER, for communion plate.　The court ordered a verdict for the defendants, and the plaintiffs excepted.

*Rand* and *Albin*, for the plaintiffs.

*C. R. Morrison* and *Briggs & Huse*, for the defendants.

DOE, C. J.　The plate was given in 1852 to the Congregational church in Francestown, for the use of that church, without any parochial condition, limitation, or trust.　By the general law, the deacons then were, and ever since have been, a corporation for the purpose of

taking and holding in succession all grants and donations made to the church. Rev. St., *c.* 144, *s.* 8; Gen. St., *c.* 139, *s.* 6. The property passed from the donor to the diaconal corporation of the unincorporated church, in trust for the use of the church. And that state of the legal title and beneficial interest has continued unchanged. The deacons are the trustee holding the title. The beneficiary entitled to the use is the church, by the disunion of whose members there are now two Congregational churches in Francestown, each claiming to be the original one. The plaintiffs are the deacons of one, the minority of the old one; and (speaking with precision sufficient for the case) the defendants are the deacons of the other, the majority.

The defendants claim that the plaintiffs' party, being the minority, are not a church, but merely members of the defendants' church. But, however this point may be decided by ecclesiastical authorities, and in whatever technical, ecclesiastical sense the word "church" may be used by any sect, the religious company of which the plaintiffs are deacons is a church, in contemplation of law. If they are members of the defendants' church, they are exercising their legal right to be members of two churches at the same time. The statutory declaration that "the trustees, deacons, church-wardens, or other similar officers of all churches or religious societies," "shall be deemed bodies corporate," cannot receive a sectarian construction. Any lawful religious association, claiming to be a church, is, within the meaning of the statute, a church whose deacons may be a corporation. The plaintiffs' party continue to attend divine service in the ancient house which the defendants' party have abandoned; they have held their meetings regularly, and kept up an organization; they claim that they are the old church; they have the plaintiffs for deacons; they have deposed the deacons who went off with the majority, and have excommunicated the defendants' party who withdrew from the parish and from the old house of worship. What they could do more than they have done towards manifesting the actual existence and maintaining the legal rights of an independent church, we need not inquire. They have certainly done enough to that end. The defendants' party are also a church: and the question is, Which is the church to which the plate was given in 1852? It is a question of identity: and that is mainly a question of fact to be determined at the trial term.

The method of organizing and perpetuating an unincorporated church is not prescribed by law. Any society claiming to be a church, and engaged in the lawful promotion or defence of religion, is a legal church. And, there being no law requiring, in its formation or continued existence, any connection with any other society, civil or ecclesiastical, incorporated or unincorporated, it may be formed, and it may exist, without any such connection. On this point there is no constitutional, statutory, or common law restriction of natural liberty. A religious society, whether it is or is not a church, is not inevitably subject, by reason of its religious character, to any peculiar disability, inherent or extraneous, degrading it to a dependent, appurtenant, or

subordinate position. Its relations with others are such as it chooses: it may choose none. A lawful religious society of any kind, a church not excepted, is as capable as a secular non-religious society of coming into and continuing in an existence independent of any other; and an unincorporated society is as capable of independent existence as an incorporated one.

Suppose two religious societies, one called a religious society or parish, the other called a church,—the former a corporation, the latter not a corporation: suppose them existing in the same town, but as separate and independent as two persons can be: there is no law requiring them to unite or to act together. Whether they shall carry on all or any part of their work separately or jointly, is a question for them to decide. And, as the law does not force them into a total or partial unity or combination of action or interest, so, if they unite in anything, the law leaves them, as it leaves other people, to make their own bargain. It is immaterial whether the parish or the church has the older organization: neither derives any legal advantage from seniority. Nor is it, in law, material whether the parish is composed of members of the church, or the church of members of the parish, or each body of entirely different members,—whether the parish is, in a certain sense, formed in the church, or the church in the parish, or each outside of the other. The character and duration of any union or joint action of the two bodies are to be found in their agreement, and not in the law. For peculiar reasons of public policy, the law does not allow the contract of marriage to be made revocable at the pleasure of the parties. But neither those reasons, nor any others producing a like result, are applicable to this case. When a parish and a church engage in any joint business, or enter into any mutual relation, the law does not say how long it shall last, nor require them to make any stipulation on that subject.

In this case, in 1852, when the plate was given, the church was, and for a long time had been, carrying on its work in the usual Congregational manner, in conjunction with an incorporated parish. In 1876, the defendants' party withdrew from the parish, and have since had no connection with it. The plaintiffs' party adhere to the parish, and contend that because of their adherence they are the church of 1852; that the defendants' party are not that church, nor members of it, because they have left the parish; that the union of the church and the parish is indissoluble, at least not dissoluble at the option of the church; that members of the church, by withdrawing from the parish, withdraw from the church. Setting up the indissolubility of the union of the parish and the church, the plaintiffs assume the burden of maintaining it.

The parish and the church could have promised to work together forever. They could have undertaken to make a contract of perpetual union. They could have agreed that every member of the church should be a member of the parish, and that every member of the church, withdrawing from the parish, should thereby cease to be a

member of the church.   Stipulations to that effect could have been inserted in their covenants, constitutions, rules, regulations, or by-laws.   In many ways, by words written or spoken, they could have attempted the construction of an inseparable confederacy.   It is not claimed that either the parish or the church ever became a party to any compact or obligation of that kind by express assent.   And in the fact that, united in sentiment and interest, they worked together in the customary Congregational way for many years, we see no evidence from which the assent of the church to an eternal league can be implied.

The accord of their joint action with Congregational custom has no tendency to show such assent without proof of the indissolubility of the customary Congregational union of parish and church: and of such proof there is none.   If this indissolubility were a Congregational rule, we should expect to find it distinctly laid down as a Congregational peculiarity by Congregational authorities, and that such proof would have been found in the exhaustive search made by competent members of the clerical and legal professions, during the controversy that was not repressed by repeated decisions in *Baker* v. *Fales* and other Massachusetts cases.   The non-discovery of such evidence is cogent proof that there is no such Congregational rule.

We need not inquire what has been the theory or practice of non-Christian nations in which church and state have been identical, and the distinction between ecclesiastical and civil power has been unknown, or of Christian nations of Europe in which church and state have been more or less thoroughly united.   An American case is to be decided upon American principles, indigenous or adopted.   In this country, all sects have contended for nothing less than the independence (congregational or associate) of their church or religious order. A church of any supernatural religion, choosing to be annexed by an inseverable tie to any human institution, like a fixture or a serf bound to the manor, would be a strange thing.   There have been instances of ecclesiastical and civil union.   But neither in practice nor in theory has the relation been a feudal one in which the church owed fealty to, and depended for existence upon its union with, the civil body.   The general rule is, that churches claim to be superhuman institutions : and this claim involves a denial of the right of human institutions to control them.   Some of them have asserted an extensive jurisdiction over human affairs.   But an evangelical church, claiming an origin and character divine, in the supernatural sense, does not profane what it holds sacred by affixing itself forever to a society of human invention, binding itself to accept such teachers as that society may select through all the vicissitudes of succeeding generations, and subjecting to a secular power the rights and the existence which it professes to hold by a divine and inalienable title.   It does not voluntarily sink into an endless servitude so inconsistent with its pretensions, its faith, and its view of its own mission and the vital interests of mankind.

The Congregational denomination is not an exception. The special signification of its name, and the distinguishing characteristic of its polity, is the independence of each church, not modified by any external ecclesiastical authority, and certainly not overwhelmed and renounced by submission to parochial or any other secular power.

The coalition of Brattle Street church and parish, of Boston, may have been so concordant more than an hundred years, and through a great theological change, that the pastor of the church has been chosen by the parish. If the members of the church were the most influential and the controlling members of the parish, as church-members usually are, there is nothing marvellous in the concord of the two bodies. Great numbers of churches and parishes, engaged in their joint concerns for long periods of time, have shown great proof of satisfaction and harmony, but no proof of obligation or compulsion. When, in Massachusetts, the parish was the town, and Congregational communicants alone were voters in church and town, they had no occasion to protest, in either body, against their own votes in the other. And, in other situations, the prolonged coöperation or partnership of churches and parishes of the same faith is not explained by a sacrilegious covenant unwittingly made by such men as Brewster, Higginson, Winthrop, and Moody, in an inscrutable manner, never written or spoken by its makers, never heard of during the first two centuries of New England history, and never acquiesced in after it was heard of. The unity of the spirit has been the bond of peace.

" A Congregational church is, by the institution of Christ, a part of the militant visible church, consisting of a company of saints by calling, united into one body by an holy covenant, for the public worship of God, and the mutual edification one of another, in the fellowship of the Lord Jesus." Cambridge Platform, *c.* 2, *s.* 6. Emigrants of that class, with zeal invigorated by persecution, came to New England for a very distinct purpose. They sought in the wilderness freedom for their religion and independence for their church. Intensely feeling and thoroughly doing what they understood was the duty of militant saints " conflicting with their enemies upon earth," they drew a line between themselves and the world ; and, in the maintenance of that line and the general prosecution of their spiritual warfare on this side of the ocean, they employed large powers of government. They did not come so far to surrender their unconquered household of faith to the domination of secular societies, the majority of whose governing members might, in time, be of the class by them denominated enemies of Christ and his church. They did not encounter the hardships and dangers of their enterprise with the intention of putting themselves and their ecclesiastical successors under a yoke that might become as galling to the Puritan conscience as that from which they fled. They did not depart so far from the general usage of religionists of their time and former times as to abandon theological supremacy. What they established in Congregational Massachusetts was, not the reign of the parish over the church, but the reign of the church over the

parish and every other civil institution.   Since their day, that order
of things has been, not inverted, but levelled, by the doctrine of equal
rights.

When the territorial parish could tax all its inhabitants, including
church-members, for the support of the minister chosen by the parish
(1 N. H. Prov. Papers 308, 447, ss. 16, 17 ; *id.* 12, 189 ; N. H. Laws,
ed. 1771, pp. 55, 138, *s.* 6, and Temporary Act of 1770, in supplement
of same vol., p. 49 ; *s.* 10 of the Act of Feb. 8, 1791, for regulating
towns and the choice of town officers), the legal right of the church
to choose and support its own pastor was not taken away.

If the Massachusetts act of 1692 ( Mass. Anc. Charters 243,
244 ; Mass. Laws, ed. 1742, p. 17) transferred the right of choosing
the minister of the town from the church to the town, the right of
choosing church officers remained in the church.   The third section
of that act, providing that the churches " shall, at all times hereafter,
use, exercise, and enjoy all their privileges and freedoms respecting
divine worship, church order and discipline, and shall be encouraged
in the peaceable and regular profession and practice thereof," was a
confirmation of their right of electing their own officers, the highest
as well as the lowest, and of all their former privileges (Anc. Char-
ters 100, 101, 104), unless the privilege of electing the ministers
of the towns was excepted.   The legal right of legal churches to elect
and support their own teachers was not identical with, and did not
include, exemption from parochial taxation.   But " all their privileges
and freedoms respecting divine worship," except the privilege of se-
lecting the officers by whom worship should be conducted, would not
be Congregational, and therefore would not comport with the policy
of Massachusetts Bay ; and an exception of that kind, without a word
alluding to it, cannot be supplied by implication.   The act required
each town " to be constantly provided of an able, learned, orthodox
minister or ministers, of good conversation."   For the case of a town
" destitute of a minister qualified as aforesaid" for the space of six
months, there was an efficient remedy in the court of quarter sessions.
During the few months' provincial experiment (Anc. Charters 255,
286 ; Mass. Laws, ed. 1742, pp. 35, 36, 70) of towns electing their
own ministers without the concurrence of the churches (if there was
such an experiment), it was possible, in legal theory, for a town to
elect a minister,—able, learned, orthodox, and of good conversation,
but not agreeable to the church,—and to support him by taxation from
which the members of the church would not be exempt.   But the
power of the churches, in the towns and in the general court, was not
overlooked.   And it was, with good reason, believed that they were
not in danger of being oppressed by their voluntary support of their
own pastors, in addition to their share of the compulsory support of
those chosen by the towns and not accepted by them.   Their election
of their own communicants was considered a right necessary to pre-
vent the corruption of the churches and the defilement of the ordi-
nances.   Cambridge Platform, *c.* 12, *s.* 6.   Their legal disability to

elect those who administered the ordinances would not have been enacted by inference, and cannot be deduced from the legislation, the usage, or the spirit of New England Puritans.

Like other Christian sects, Congregationalists have professed to establish churches on the primitive Christian model. And they have not believed that the first church of Jerusalem was founded or maintained in infrangible parochial bonds, or that the disciples who were first called Christians were members of their church so long only as they continued to bear faith and true allegiance to a first parish of Antioch, or some other parish.

We cannot but take judicial notice of the historical fact, that American Congregationalism has always been a vehement and uncompromising protest against a union of a church and a secular body, not revocable at the pleasure of the church. In the fact that this Francestown church for a long time was harmoniously connected with a parish in the usual Congregational manner, it is impossible to find any evidence of an assent of the church to an indissoluble union. And it is not necessary to inquire what would be the legal effect of such assent, express or implied.

The sixth article of the bill of rights empowers the legislature to authorize " towns, parishes, bodies corporate, or religious societies," to provide, at their own expense, for the support of public religious teachers, "Provided, notwithstanding, That the several towns, parishes, bodies corporate, or religious societies, shall at all times have the exclusive right of electing their own public teachers, and of contracting with them for their support and maintenance." This proviso is a Congregational charter not generally found in the constitutions or statutes of other states. Watson v. Jones, 13 Wall. 679, 726; McAuley's Appeal, 77 Pa. 397, 413, 418; Schnorr's Appeal, 67 Pa. 138, 146, 147, and cases cited in 9 Am. Law Reg. 211; 10 id. 295; 12 id. 201, 329, 537; 13 id. 65; 15 id. 264; 18 Monthly Law Reporter 421; Hoffman's Eccl. Law of New York, c. 23. The plaintiffs claim that it gives the parish the right of electing the pastor of the church. It was taken from the third article of the Massachusetts declaration of rights of 1780; and it means here what it meant in Massachusetts. We are not aware of any record or tradition tending to show that the Massachusetts convention or people understood that it would effect such a revolution as the transfer from the church to the parish of the right of the church to elect its own teachers. 4 Works of John Adams 221 n. 3, 222 n. 7; Journal of the Convention 40, 41, 45, 46, 218, 221. Nor are we aware of any change in the theory, the practice, or the situation of the Congregational denomination, who controlled the convention and the state, that could account for their adoption of an innovation so hostile to their original polity. There is no allusion to such an innovation in the address to the people, in which the convention comment upon the third article of the declaration and other parts of their work, and at the close of which they say,—" Thus we have, with plainness and sincerity, given you

the reasons upon which we founded the principal parts of the system laid before you, which appeared to us as most necessary to be explained."

The Cambridge Platform declares that the power of choosing and deposing their own officers is a "prerogative" "granted by Christ" to each church ; and that " a church being free, cannot become subject to any but by a free election ; yet when such a people do choose any to be over them in the Lord, then do they become subject, and most willingly submit to their ministry in the Lord, whom they have so chosen." *C.* 5, *s.* 2; *c.* 8, *ss.* 2, 5, 6, 7; *c.* 10, *ss.* 2, 5. If the Massachusetts constitutional convention of 1779–'80, in the midst of the struggle for liberty, had proposed that the power, believed, at least by men of controlling influence, if not by the majority of the voters, to be a "prerogative" "granted by Christ" to the church, should be taken from the church, by the Puritan commonwealth, and granted to the parish, it seems equally certain that the proposition would have been regarded by the convention as one necessary to be explained, and that no explanation would have induced the people to accept it. No such overthrow of a fundamental doctrine of the ruling class could have been intended.

And, if the legal meaning of the proviso cannot be drawn from the actual intent of the men who adopted it, it cannot, by legal construction, be made an inexplicable anomaly in our system of civil and religious rights. If the object had been to give to one society the right of electing the principal officer of another society, such an offensive discrimination would hardly have been established in the form of this proviso in such a context. The words, "*Provided, notwithstanding*," are significant. They emphasize a limitation of legislative power in ecclesiastical affairs, and introduce, not an invasion, but a guaranty, of religious independence. Not only is there no word indicating a design of depriving any religious association of the right of electing their own teachers, but the contrary design is expressed. A church, incorporated or unincorporated, not connected with a parish, has the exclusive right of electing its own teachers. An infringement of that right would be a violation of the constitution, which makes no distinction between religious societies that are connected and those that are not. And a constitutional privilege is not lost by a joint use of it, or by non-user.

The exclusive character of the electoral power of the church is illustrated in the Cambridge Platform by the statement that the choice of church officers "belongeth not to the civil magistrates, as such, or diocesan bishops, or patrons." *C.* 8, *s*, 9. In Massachusetts, from 1693 to the adoption of the constitution, the legal right of electing the teachers of the parish was a concurrent one, vested in the church, the parish, and (after 1695) an ecclesiastical council. That concurrent system was explicitly abolished by the constitutional reservation of "the exclusive right." *Avery* v. *Tyringham*, 3 Mass. 160, 180. In the literal and in the broad sense, a church is a religious society.

N. H. Laws, ed. 1771, Supplement, p. 50, s. 2. If it is a religious society. within the meaning of the reservation, its right of electing its own teachers is reserved.   If it is not a religious society, within the meaning of the reservation, its electoral right is not wrested from it by the guaranty of the right of religious societies to elect their own teachers. The general tenor of the whole instrument requires a liberal construction in favor of complete ecclesiastical liberty and equality.   The reservation of the " natural and unalienable" right of worship (in the fifth article of our bill of rights) might well be regarded as an equivocation if it did not secure to worshippers their collective as well as their individual right of selecting their spiritual guides.

Our conclusion is, that there is no constitutional or statutory provision, or common law principle, that compels a church and a parish to form any union or connection, or requires permanence in any union or connection they may see fit to form,—and that there is no evidence tending to show the assent of the Francestown church to any other parochial relation than an alliance at will, dissolvable, without notice or ceremony, by either party refusing to continue it.

The only difficulty we have met in coming to this conclusion is in the Massachusetts authorities holding the contrary doctrine.   *Baker* v. *Fales*, 16 Mass. 488 ; *Stebbins* v. *Jennings*, 10 Pick. 172 ; *Sawyer* v. *Baldwin*, 11 Pick. 492; *Page* v. *Crosby*, 24 Pick. 211; *Parker* v. *May*, 5 Cush. 336, 345, 346 ; *Weld* v. *May*, 9 Cush. 181, 187 ; *Tib-balls* v. *Bidwell*, 1 Gray 399, 405 ; Judge Shaw, in Ellis's Half Century of the Un. Con. 427.   The first and second of these authorities give the reasoning on which the Massachusetts rule is established. *Baker* v. *Fales* was replevin for certain property of the first church of Dedham, consisting of bonds and other securities for the payment of money, and the records and documents of the church.   The bonds and other securities were derived from the proceeds of the sales of lands given to the church ; but it was not claimed that all the church records and documents were derived from those proceeds.   Judgment was rendered for the plaintiffs for the records and documents, as well as for the securities.   The decision seems to be largely based on the ground that the lands and proceeds were held in trust for the benefit of the parish, and it does not appear how that ground sustains the decision in reference to the records and documents.

The grants of the lands could have been so made that the lands and proceeds could be held or used only by a church remaining in Dedham, or worshipping in a particular street, or connected with the parish, or applying the property to the benefit of the parish.   But the right of the church to leave the parish and the town would not be destroyed by such limitations of the title or use of property.   If the church, or its diaconal corporation, could accept and execute a trust for the benefit of the parish, it could resign or be removed from the office of trustee, and retain its own property in which the parish had no legal interest.   The fiduciary obligation would not include an indissoluble union between the trustee and the beneficiary.   In *Baker* v. *Fales*,

the character of donations, the diversion of trust funds, and the right of parishes to elect their own teachers, were fully considered. But, if the distinction between those points and the nature of the union of the church and the parish was duly observed, it does not appear that the distinct question of the dissolubility of the union received much attention.

In *Stebbins* v. *Jennings*, a part of the property in controversy had been given, by will, to " The Church in the Third Precinct in Brookfield," and the rest had been acquired by that church in some manner unknown. The decision seems to be, that a union of a church and a parish is indissoluble : but the reasoning does not, in our judgment, go beyond the proposition, that a church united with a parish is a church of that parish.

A church in a territorial parish is, in a certain sense, a church of that parish, as a church in a street, town, or state, is a church of that street, town, or state. If there are two or twenty churches in the same territory, they are all churches of that territory. Like other associations, they may derive convenient and appropriate designations from their localities. But the convenience and appropriateness of local names do not impose upon churches or other societies a legal disability to go from one place to another. The law does not require their names to be convenient or appropriate. Churches and other societies, as well as individuals, may have several names, and may change their names. As individuals, and (not to speak unnecessarily of the removal of corporations from one state to another) as legal unincorporated churches or other legal unincorporated societies, men can migrate, and in their new homes they can retain their former names, or assume new ones. Whether individuals and associations are stationary or itinerant, their identity is not preserved or lost by a continuance or a change of name. Without a name, as well as with a name, changed or unchanged, a church, or other society, religious or non-religious, may be transplanted from Nauvoo to Salt Lake, and may survive a Mosaic exodus or Babylonish captivity. The First Church of Boston was once the first church of Charlestown. If it had been called The First Church of Charlestown to this day, it would, nevertheless, have been the first church of Boston, after it crossed the river. Notwithstanding its present Boston name, it is the church that once was the first church of Charlestown. If property had been given to it before its removal, could it have legally carried the property to Boston ? That is a question of the donor's intent, to be ascertained under legal rules. It is not the question of the mobility of the church. If the title or use of property had been given with the limitation, to be held or enjoyed by that church so long only as it should abide in Charlestown, that restriction would not have deprived the church of the liberty of locomotion. Its identity was no more affected by its change of domicil than by its subsequent change of doctrine.

The identity of a church rests upon similar principles, whether it is

connected with a territorial or a poll parish.  A church may be called the church of the parish with which it is connected : a parish may be called the parish of the church with which it is connected.  In neither case does the name render the union indissoluble.  More than one church may be united with one parish : more than one parish may be united with one church.  The union of one church and one parish, at the date of a will, may point out the legatee described by the testator in a bequest of property to the church of that parish or the parish of that church.  A gift may be made to a church connected with a certain parish at the time the gift is made, or to a church so connected at all future times.  The intent of the donor, ascertained in accordance with legal rules, controls the destination of his property, but does not control the right of the church to dissolve its parochial connection.  A church closely connected with a parish, may be properly called a church of that parish.  Upon the termination of the connection, the church, ceasing to be the church of that parish, does not cease to be the church that once was the church of that parish.

If the indissolubility of the union of a Congregational church and parish is a sound conclusion of fact or law, it is drawn from some fact that can be stated, some clause of the constitution or statutes that can be read, or some common law principle that can be distinctly enunciated.  It is not, in our opinion, supported by any ground of law to which our attention has been called : and, if we look into the facts for the contract, that is, the understanding of the parties, we are bound to recognize the historical fact, that, in the understanding of the denomination, the indissolubility contended for is repugnant to elementary principles of Congregationalism.

Two years after Judge PARKER delivered the judgment in *Baker* v. *Fales*, he said (in *Holbrook* v. *Holbrook*, 1 Pick. 248, 257) it was impossible for any one to doubt the soundness of the elaborate opinion of PARSONS, in *Barnes* v. *Falmouth*, 6 Mass. 401.  The decision in *Barnes* v. *Falmouth* is pervaded by a profound conviction of the wretchedness of man not assisted in the protection and enjoyment of life, liberty, and property, and the acquisition of an inheritance in a better country, by religious corporations, legally authorized and required to exercise ample powers of taxation.  Memoir of Parsons 201, 202, 203.  This view, sustained by the general union of church and state throughout the world, and supposed to be adopted by Massachusetts in the constitutional policy of the compulsory support of religious worship (not abandoned until 1833), might lead to the doctrine of indissolubility in *Baker* v. *Fales*, and the cases of that class. In ecclesiastical effect, *Barnes* v. *Falmouth* sustained orthodoxy against Universalism in 1810, and *Baker* v. *Fales* sustained Unitarianism against orthodoxy in 1820.  In legal effect, both cases sustained parochial corporations as the framework of the religious establishment.

In 1817, the court (Judge PARKER delivering the opinion) lament " the great inconveniences, and the injury to public morals and re-

ligion, and the tendency to destroy all the decency and regularity of public worship, which may result from" allowing all persons "to associate, and withdraw themselves from the regular and established religious societies in towns and parishes, which, being by law obliged to support public teachers, may thus have their means and power so much diminished as to render that duty oppressive and burdensome;" and declare that "the mischief to be dreaded is the breaking up of the parochial religious establishments." *Adams* v. *Howe*, 14 Mass. 340, 344, 348. Regardless of sectarian interests, but not of the general cause of religion and the welfare of the state, and deprecating the breaking up of the parochial establishments as a public calamity, the court looked upon the separation of churches from parishes as the ruin of ecclesiastical institutions, and the division of forces whose union was essential to the happiness and safety of the community. But, in such considerations of public policy, we do not see any evidence of an assent of the Francestown church to an indissoluble union with a parish, or any authority for the judicial introduction of a peculiar rule discriminating between churches and other societies, and infringing the natural rights of the former by making their parochial connections permanent, against their will.

The defendants' party kept up a church organization: but it does not appear that they did, and that the plaintiffs' party did not, keep up the organization of the old church; and for this reason the verdict, ordered for the defendants, cannot be sustained. Associated bodies are, in fact, generally controlled by majorities. But the distinction between a society and a majority of its members is not abolished by law; and there is no legal presumption that a majority are, at all times and places, and under all circumstances, the society. We cannot assume that the church to which the plate was given has no regular method of procedure established for the perpetuation of its existence and the preservation of its identity, or that its constitution is such that a majority of its members, called together by anybody, by any means, for any purpose, at any time and place, are the church. The natural presumption is, that it has expressly or tacitly adopted some regulation or usage on the subject of its organic succession, and that, by its own law, its continuous life is in members maintaining, not an organization in any manner, but its organization in some authorized manner consistent with all things being done decently and in order.

FOSTER, BINGHAM, and ALLEN, JJ., concurred. The other judges did not sit.

*New trial granted.*